

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-15-1999

# United States v. Zwick

Precedential or Non-Precedential:

Docket 98-3641

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"United States v. Zwick" (1999). *1999 Decisions.* Paper 323.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/323

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 15, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3641

UNITED STATES OF AMERICA

v.

JAMES J. ZWICK,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Criminal Action No. 97-cr-00182-1)
(District Judge: The Honorable William L. Standish)

Argued: July 15, 1999

Before: ROTH, RENDELL, Circuit Judges, and
POLLAK,* District Judge

(Filed December 15, 1999)

        SHELLEY STARK, Esquire
        [ARGUED]
        Office of Federal Public Defender
        960 Penn Avenue
        415 Convention Tower
        Pittsburgh, PA 15222
        Counsel for Appellant

_____

* Hon. Louis H. Pollak, Senior Judge of the United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

ROBERT S. CESSAR, ESQUIRE
[ARGUED]
Office of U.S. Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA 15219
Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

In this appeal, we are asked to construe 18 U.S.C.S 666, a criminal provision entitled "Theft or bribery concerning programs receiving Federal funds" ("the Act" or "the statute"). Appellant James J. Zwick claims that the District Court misinterpreted the statute when it upheld his three-count conviction for bribery under S 666(a)(1)(B) without proof of a connection between the offense conduct and federal funds or programming. We conclude that the District Court erred in interpreting the statute in this respect and will therefore remand for further proceedings consistent with this opinion. Zwick also challenges the District Court's failure to reduce his offense level by an additional point for acceptance of responsibility pursuant to U.S.S.G. S 3E1.1(b). Because we find that the District Court erred in its application of this Guideline provision, we will vacate this aspect of the sentencing order and direct the District Court on remand to award the additional one-point reduction if it determines that Zwick timely provided complete information to the government or timely notified the government of his intent to plead guilty to enable the government and court to conserve their resources.[1]

I.

Appellant James J. Zwick was an elected member of the Ross Township Board of Commissioners, the governing body of Ross Township, Pennsylvania. Zwick and his fellow

_____

1. We reject Zwick's remaining challenges to the application of the statute to his particular situation, as we discuss more fully below.

2

commissioners made policy decisions for the Township, including fixing salary levels, executing contracts, authorizing bids, and adopting budgets. In November of 1997, the government accused Zwick of abusing his position to obtain illegal benefits and filed afive-count indictment charging him with three counts of theft or bribery concerning federal programs under 18 U.S.C.S 666, one count of mail fraud under 18 U.S.C. SS 2 & 1341, and one count of bank fraud under 18 U.S.C. SS 2 & 1344. The District Court had jurisdiction over Zwick's case pursuant to 18 U.S.C. S 3231.

Initial efforts at negotiating a guilty plea failed when the government declined to accept a conditional plea, which would have preserved Zwick's legal challenge to the application of S 666 when there is no connection between a defendant's conduct and federal funds or programming. After declining to accept the plea, the governmentfiled a superseding indictment, which contained all of the charges in the original indictment, and added another count of theft or bribery under S 666, another count of bank fraud, and three more counts of mail fraud. Again, Zwick was willing to plead guilty to the bank fraud and mail fraud counts, but continued to seek a conditional guilty plea on the S 666 counts. During a status conference on January 27, 1998, Zwick informed the District Court of his intention to plead guilty to the fraud counts, and the District Court scheduled the plea hearing for February 2, 1998. Further plea negotiations were derailed, however, when articles appeared in the Pittsburgh Post Gazette and North Hills News Record on January 28, 1998 and January 29, 1998, declaring that Zwick would plead guilty to the fraud charges. Zwickfiled a motion with the District Court to dismiss the indictment based on prosecutorial misconduct, alleging that, by providing information for the articles, the government had violated its obligation to refrain from making extrajudicial statements regarding the possibility of a guilty plea. The District Court denied Zwick's motion. Zwick ultimately entered a guilty plea to the fraud counts on March 9, 1998.

The case against Zwick on the S 666 charges proceeded to trial on March 10, 1998, after a brief continuance so that Zwick could enter treatment for his gambling addiction.

Although Zwick waived his right to a jury trial and requested a bench trial, the government opposed this request, so the case was tried to a jury. Zwick was convicted on counts one, two, and three of the four S 666 charges.

Because Zwick makes several challenges to the sufficiency of the evidence to support his conviction under S 666, we will review the relevant facts adduced at trial regarding the alleged bribes. In count one, the government alleged that Zwick solicited a bribe from Christopher Kaclik, the owner and developer of the Shannopin Square II office building located in Ohio Township. Kaclik first became associated with Zwick in 1994, when he applied for sewer access for the predecessor to Shannopin Square II, Shannopin Square I. At that time, Kaclik testified that Zwick told him "anything you need to get done in the Township of Ross, I can help you out." In May or June of 1996, during the building of Shannopin Square II, Zwick met with Kaclik at the development site and offered to secure the necessary votes for approval of the sewer taps in exchange for a donation to the "Men's Summer League for Ross Township," a basketball league run by Zwick. Kaclik wrote a check for $5,000, made out to "James Zwick," with a notation reading "Men's Summer League 1996 Basketball." At Zwick's suggestion, Kaclik also provided Zwick with a blank check for $7,500, which Zwick falsely represented he would put toward the $17,500 required to reserve the sewer taps. When Kaclik discovered that Zwick had personally endorsed and cashed the checks, he asked that Zwick return the money. After repeated phone calls to Zwick, Kaclik received $2,500 from Zwick.

Count two involved Zwick's dealings with the Fosnights, who had obtained an option on property in Zwick's ward in Ross Township to build and operate an assisted living facility there. To complete their project, the Fosnights were required to obtain approval from the Ross Township Board of Commissioners for various permits, including a conditional use permit and site plan approval. On September 9, 1996, after the Township Planning Commission had already recommended approval of the conditional use permit, the Board of Commissioners voted

4

to table the permit for further investigation. After that meeting, Zwick contacted Tim Fosnight and set up a meeting with him and his brother Aaron at the project site. Zwick offered to help them obtain the required permits in exchange for a $15,000 donation to construct a playground on the grounds of his "pet" project, North Hills Affordable Housing ("NHAH"). Zwick explained that he could require the Fosnights to pay for a new traffic light and traffic studies, which could involve significant costs of up to $100,000 and lead to considerable delay, but he would not do so if such a "donation" was made.

The Fosnights made four payments to Zwick totaling $10,500. Zwick directed them to make out the first two checks to "CSC"[2] and "Cash" totaling $4,500. Zwick cashed both, and the funds were never received by NHAH. The next two checks, totaling $6,000, were made out to NHAH. Nonetheless, upon receipt of the funds, Judith Eakin, Director of NHAH, wrote Zwick two checks for $6,000 as payment for the telephone system Zwick was installing for NHAH, the project Zwick told the Fosnights their contribution would fund. Two months later, Zwick informed Eakin that more money was needed to purchase equipment that would complete the telephone system. When Eakin told Zwick that NHAH had no additional funds available for the telephone system, as no additional funds were in hand, Zwick assured Eakin that a further donation would be forthcoming from the Fosnights, and that, if the anticipated donation were not to be received in timely fashion, Zwick would personally guarantee the sum in question. In reliance on Zwick's personal guarantee, Eakin was authorized by her board president to advance Zwick the money required to purchase the equipment. Accordingly, in the ensuing two weeks, Eakin issued Zwick two checks totaling $7,440 made out to "Jim Zwick" as payment for the phone system. Shortly thereafter, Eakin agreed to issue Zwick two "replacement" checks for $7,740 when Zwick informed her that his accountant said the earlier checks should have been issued to his company, Jim Zwick Communications Systems, and not to him personally. Although Zwick provided Eakin with a check for $7,740 to

_____

2. CSC is an abbreviation for the name of Zwick's company. App. 427.

5

replace the check issued to him personally, when NHAH attempted to cash it, it was returned from the bank due to an irregular signature. NHAH never received these funds.

Zwick provided the Fosnights with a traffic study from his office so they would not have to finance their own, and the Fosnights did not make a contribution to the costs of constructing a traffic light. Zwick voted for the approval of the Fosnights' conditional use permit. He also moved to approve the Fosnights' final site permit but abstained from voting on it, explaining that he might put a bid on the telephone work for the project and did not want to create the appearance of a conflict of interest.

Count three charged that Zwick had solicited bribes from Justin Ruff, the owner of Admiral Lawn Service, when he asked Ruff for "performance bonds" in exchange for ensuring that Ruff was awarded landscaping contracts with Ross Township. Although bonds were required for contracts over $10,000, Ross Township commissioners were not authorized to solicit or accept them, and certainly not entitled to cash them. Performance bonds were supposed to be kept in escrow and returned once the project was complete. In the summer of 1996, Ruff gave Zwick two blank checks for $3,500 in connection with a landscaping contract in Denny Park, Ross Township. Although Ruff was awarded the contract and performed the work, his checks were never returned to him; Zwick had cashed them and kept the proceeds. Zwick eventually repaid Ruff after Ruff repeatedly asked him to do so. Zwick continued to solicit bribes from Ruff in connection with various projects, including $4,500 for a $45,000 project that included cutting grass and dragging ball fields in Ross Township. Ruff repeatedly refused to pay Zwick after becoming aware that Zwick's requests violated Ross Township's policy regarding performance bonds.

After he was convicted on the three counts, Zwick filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The District Court denied the motion on October 5, 1998. The Probation Office prepared a Presentence Investigation Report recommending that Zwick be awarded a two-point reduction for acceptance of responsibility pursuant to U.S.S.G. S 3E1.1(a). However, the

6

Probation Office Report did not recommend awarding the extra one-point reduction available under S 3E1.1(b) because the government had to prepare for trial on the bribery counts. The District Court found that the Probation Office's conclusion was a reasonable one "[b]ased on the unusual circumstances and procedural posture of this case." The District Court also considered that Zwick raised factual issues at trial, rather than limiting himself to legal arguments. The District Court sentenced Zwick to concurrent terms of thirty-three months as to each count, to be followed by five years of supervised release. Zwick filed the instant appeal. We have jurisdiction pursuant to 28 U.S.C. S 1291.

II.

Zwick contends that the evidence as to all three counts of his S 666 conviction is insufficient because the government failed to prove the existence of any connection between his conduct and federal funds or programming. Specifically, he argues that S 666 requires such a connection, or, alternatively, that the statute is unconstitutional as applied to him. We exercise plenary review over questions of statutory interpretation. See United States v. Hayden, 64 F.3d 126, 128 (3d Cir. 1995).

The federal bribery statute at issue, 18 U.S.C.S 666, provides in pertinent part:

> S 666. Theft or bribery concerning progr ams receiving Federal funds
>
> (a) Whoever, if the circumstance described in subsection (b) of this section exists --
>
> (1) being an agent of an organization, or of a Sta te, local, or Indian tribal government, or any agency thereof --
>
> . . . .
>
> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any

7

business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

.  .  .  .

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

Prior to the enactment of S 666 in 1984, the limited scope of the federal bribery statute and general theft of property statute hampered the federal government's efforts to reach crimes affecting federal interests due to tracing requirements and limitations on application to non-federal employees. See 18 U.S.C. SS 201, 641. By its terms, S 666 fills these particular voids; it imposes no title or tracing requirements and covers non-federal employees. The government only must prove the basic elements of the S 666 offense. However, as Zwick's challenge reveals, the law is unsettled as to what S 666 requires. In Salinas v. United States, 522 U.S. 52, 118 S. Ct. 469, 475 (1997), the Supreme Court resolved one significant issue, namely, that the government need not show federal funds actually were involved in or affected by an alleged bribery transaction. Yet, the Court specifically left open the question before us, that is, to what extent the statute "requires some other kind of connection between a bribe and the expenditure of federal funds." Id. at 474. We had prior occasion in this Circuit to examine the scope of S 666, see United States v. Cicco, 938 F.2d 441, 444 (3d Cir. 1991), but we have not addressed the specific question before us in this case. It is instructive to review the approaches taken by federal courts that have considered the extent to which S 666 requires a relationship between the offense conduct and federal funds or programs.

8

## A. Pre-Salinas

Prior to Salinas, courts evaluated the requisite relationship under S 666 between a corrupt act and federal funds or programming from a number of different perspectives. Several courts viewed the statute's "plain language" as lacking any requirement, either implicitly or as an element of the offense, that the government prove federal money was directly involved in, or traceable in some way to, the corrupt transaction. Bolstering their view was the rationale that Congress sought to "cast a broad net" in protecting the integrity of agencies receiving federal funds and thus enacted S 666 with the specific intent to eliminate any tracing requirements that previously had obstructed prosecution efforts. See United States v. Westmoreland, 841 F.2d 572, 576-578 (5th Cir. 1988) (holding that direct involvement of federal funds in transaction is not an essential element of bribery charge under S 666); see also United States v. Pretty, 98 F.3d 1213, 1218-1219 (10th Cir. 1996) (finding that the defendant was chargeable under S 666 even if actual money could not be traced to a federal program); United States v. Paradies, 98 F.3d 1266, 1288-89 (11th Cir. 1996) (agreeing with Westmoreland that S 666 does not require that the government trace the flow of federal funds to a particular project); United States v. Valentine, 63 F.3d 459, 464-65 (6th Cir. 1995) (holding that government does not need to prove that the misappropriated funds actually came from a federal program in a theft case); United States v. Simas, 937 F.2d 459, 463 (9th Cir. 1991) (concluding that the government was not required to trace federal funds to the project at issue to establish a S 666 violation).

Interpreting a different subsection of S 666, others held that the program touched by bribery need not be the direct and actual recipient of $10,000 per year in federal funds. See United States v. Coyne, 4 F.3d 100, 109-110 (2d Cir. 1993) (finding that S 666 lacks any requirement that the program at issue be the actual recipient of federal funds); United States v. Little, 889 F.2d 1367, 1369 (5th Cir. 1989) (same).

When asked to uphold convictions or find defendants guilty with no proof of a federal interest in the corrupt act,

however, some courts were reluctant to do so. See United States v. Foley, 73 F.3d 484, 488-493 (2d Cir. 1996) (reversing Foley's conviction after government did not prove that corruption in some way touched on federal funds); United States v. Frega, 933 F. Supp. 1536, 1540-1541 (S.D. Cal. 1996) (dismissing indictment for failure to allege that "federal funds were corruptly administered, were in danger of being corruptly administered, or even could have been corruptly administered."). Courts in this camp expressed concern that interpreting S 666 to have no federal interest requirement would make a federal offense out of routine local bribery, dramatically changing the state-federal balance without an express Congressional directive that it intended to do so. See Frega, 933 F. Supp. at 1540.

Courts finding that a federal connection is required were comfortable reaching this result even though they agreed that S 666 does not require tracing of funds or proof of an effect on federal funds and programs. For example, the Ninth Circuit's holding in Simas, that tracing is not required, did not prevent the District Court for the Southern District of California from concluding in Frega that S 666 requires a federal connection. Likewise, the Court of Appeals for the Second Circuit held thatS 666 does not require that the corrupt act actually affected federal funds in United States v. Bonito, 57 F.3d 167, 172-173 (2d Cir. 1995), but concluded in a subsequent case that S 666 does require proof that the corruption has some connection with federal funds. See Foley, 73 F.3d at 493. A circuit split was created between the Second and Fifth Circuits when the Fifth Circuit held that a defendant's conduct fell within S 666 without specifically requiring a connection between the corrupt act and the federal funds, other than the fact that the accepters of the bribes were local government agents with duties relating to a federally-funded program. See United States v. Marmolejo, 89 F.3d 1185, 1203 (5th Cir. 1996), aff'd, Salinas v. United States, 118 S. Ct. at 474.3 Neither Foley nor Marmolejo was a

_____

3. Marmolejo and Foley also parted ways regarding how to determine whether the transactions at issue are equal to or greater than $5,000 in value.

10

unanimous decision.4

B. Salinas

On certiorari from the Fifth Circuit's Marmolejo decision,
the Supreme Court did not resolve the broad question
before us of whether defendants can be prosecuted under
S 666 absent a federal interest in the offense conduct, but
instead addressed the narrower question of whether S 666
applies only when the bribe has a demonstrated effect on
federal funds. Salinas, 118 S. Ct. at 472. 5 The Court found
that the statute's "expansive, unqualified language, both as
to the bribes forbidden and the entities covered, does not
support the interpretation that federal funds must be
affected to violate S 666(a)(1)(B)." Id. at 473. The Court
acknowledged that it could depart from a statute's clear
language upon an extraordinary showing of contrary
intentions in the legislative history. See United States v.
Albertini, 472 U.S. 675, 680 (1985). However, because the
statute was enacted to expand the application of federal
bribery provisions to non-federal employees, the Court
found that it would be "incongruous" to restrict S 666 so

_____

4. In the Foley dissent, Judge Lumbard argued, in essence, that there is
no federal connection requirement. Foley 73 F.3d at 494-497 (Lumbard,
J., dissenting). Rather, the plain language of S 666 simply outlaws bribes
to agents of organizations that receive federal funds: "It is sufficient
that
Foley was an agent of a government that received $10,000 in federal
funds and that he took a bribe involving something worth at least
$5,000." Id. at 495. Taking the opposite view in the Marmolejo dissent,
Judge Jolly endorsed the Second Circuit majority's reasoning in Foley;
he argued that the Marmolejo majority misinterpreted its earlier decision
in Westmoreland, on which it relied, and that S 666 was not intended to
criminalize all acts of bribery involving entities that happened to
receive
some federal funding. Marmolejo, 89 F.3d at 1201-1204 (Jolly, J.,
dissenting).

5. Salinas, a deputy sheriff for Hidalgo County, Texas, was convicted
under S 666 for accepting benefits from a federal prisoner in his custody
in exchange for allowing the prisoner to have "contact visits" with his
wife and girlfriend. See Marmolejo, 89 F.3d at 1191. Hidalgo County had
an agreement with the federal government to house federal prisoners in
exchange for grants for improving its prison as well as payment per day
for each federal prisoner housed. Id.

11

that it applies only when a demonstrated effect on federal funds is shown. Salinas, 118 S. Ct. at 473. Significantly, the Court found only that the "text of S 666(a)(1)(B) is unambiguous on the point under consideration here." Id. at 475 [emphasis added]. The Court did not reach a holding on whether another kind of federal connection was required under S 666, believing that the facts of Salinas' case presented a sufficient connection:

> We need not consider whether the statute requires some other kind of connection between a bribe and the expenditure of federal funds, for in this case the bribe was related to the housing of a prisoner in facilities paid for in significant part by federal funds themselves. And that relationship is close enough to satisfy whatever connection the statute might require.

Id. at 474. The Court accordingly rejected a challenge to the constitutionality of the provision, at least as applied to Salinas:

> Furthermore, there is no serious doubt about the constitutionality of S 666(a)(1)(B) as applied to the facts of this case. Beltran was without question a prisoner held in a jail managed pursuant to a series of agreements with the Federal Government. The preferential treatment accorded to him was a threat to the integrity and proper operation of the federal program. Whatever might be said about S 666(a)(1)(B)'s application in other cases, the application of S 666(a)(1)(B) to Salinas did not extend federal power beyond its proper bounds.

Id. at 475.

C. Post-Salinas

Courts clearly have recognized that Salinas left open the question of whether S 666 requires that a federal interest be implicated by the offense conduct. See United States v. Dakota, 188 F.3d 663 (6th Cir. 1999) (finding that in Salinas, "the nature of any necessary connection is left unanswered"); United States v. Santopietro, 166 F.3d 88, 93 (2d Cir. 1999) (finding that the Supreme Court "was careful

12

to note that the statute survived the constitutional as-applied challenge because the benefit obtained by means of the bribe -- the preferential treatment -- `was a threat to the integrity and proper operation of the federal program.' "). Therefore, Salinas has not prevented courts from reaching conflicting conclusions on whether S 666 requires proof of a federal interest in the offense conduct. The Sixth Circuit held post-Salinas that S 666 does not require proof of a connection between the offense conduct and federal funds or programming. See Dakota, 188 F.3d at 668 (finding no connection requirement based on its determination in its pre-Salinas decision in Valentine, a theft case, and providing no additional case cites or reasoning). Taking the opposite view, the Second Circuit held that its holding in Foley -- that some federal connection was required -- remained good law post-Salinas. See Santopietro, 166 F.2d at 93. The District Court of Massachusetts determined post-Salinas that S 666 was unconstitutional as applied to the defendant in that case, reasoning that the conduct at issue was not related to a legitimate national problem as required by South Dakota v. Dole, 483 U.S. 203, 207-08 (1987) and thus Congress exceeded its bounds under the spending clause. See United States v. McCormack, 31 F. Supp.2d 176 (D. Mass. 1998).6

_____

6. Judge Gertner comprehensively evaluated whether "S 666 give[s] federal authorities a blank check to prosecute ostensibly significant acts of corruption involving the Malden Police Department just because the department receives a certain level of federal funds." Id. at 181. While expressing the view that the relevant language inS 666(a)(1)(B), "in connection with any business or transaction," is ambiguous and requires an examination of legislative history, id. at 186 (citing Foley, 73 F.3d at
490 – 492 and Frega, 933 F. Supp. at 1543), Judge Gertner concluded that Salinas foreclosed her from so ruling based on Salinas' holding that S 666(a)(1)(B) is clear and unambiguous. McCormack, 31 F. Supp.2d at 186. Yet, the Court acknowledged that Salinas expressly left open the possibility that S 666(a)(1)(B) is unconstitutional as applied to cases that
lack some connection between the corrupt activity and federal funds or programming. The Court also found McCormack's prosecution under S 666 deficient in another respect relating to the "$5,000 value" requirement. Id. at 189.

13

III.

Zwick asks us to add our voice to the chorus of opinions regarding the need to prove that a federal interest was implicated by corrupt acts in a S 666 prosecution. To reach our own determination of whether S 666 requires such proof, we begin by examining the statutory language itself. See Collinsgru v. Palmyra Bd. of Educ., 161 F.3d 225, 233 (3d Cir. 1998) (evaluating the Individuals with Disabilities Education Act) (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235 (1989)).

Section 666(a)(1)(B) requires proof that a bribe was given "in connection with" any business or transaction of an agency described in subsection (b), namely those receiving funds under certain federal assistance programs. The language does not state explicitly that the government must show a connection between the bribe and federal interests. Yet, the title of S 666, "Theft or bribery concerning programs receiving Federal funds," implies that a federal connection is anticipated, as does the statute's reference only to "agents" of entities receiving federal funds who accept bribes "in connection with" the business of the organization receiving federal funds.

The wording of this statute is far from straightforward in many respects. Our reading of the statute, and the struggle of other courts to construe its meaning, lead us to conclude that S 666 can hardly be described as "plain to anyone reading the Act." Gregory v. Ashcroft, 501 U.S. 452, 467 (1991) (interpreting Federal Age Discrimination in Employment Act).7 The only thing plain about the statute is that it yields two plausible alternative interpretations on the issue raised by Zwick. While noting that the fact

_____

7. We find that nothing in Salinas prevents us from determining that S 666(a)(1)(B) is ambiguous on the issue of whether there is a federal connection requirement, thus we disagree with the determination on this point reached by the District Court in McCormack. See McCormack, 31 F. Supp.2d at 186 (finding that "Salinas has shut off this avenue of analysis."). Salinas found S 666(a)(1)(B) clear and unambiguous only on the question of whether the government must prove that the corrupt activity had a demonstrated effect on federal funds or programming. Salinas, 118 S. Ct. at 475.

14

pattern in Salinas satisfied any federal connection test that S 666 might require, the Supreme Court pointedly skirted the issue of whether the statute clearly mandated such a connection, suggesting that the possibility of more than one interpretation is valid. The most literal interpretation -- that the statute lacks a federal connection requirement -- is troubling from an interpretative standpoint in that it broadens the range of activity criminalized by the statute and alters the existing balance of federal and state powers by encompassing acts already addressed under state law in which the federal government may have little interest. We cannot embrace such a broad reading of this federal criminal law unless that is the clear directive from Congress. Given the statute's ambiguity on this question, we will consult the legislative history. See Director, Office of Workers' Compensation Programs v. Sun Ship, Inc., 150 F.3d 288, 291 (3d Cir. 1998); Collinsgru, 161 F.3d at 233.

Before proceeding further, it is worth reviewing our prior analysis of S 666, albeit on a different issue, in United States v. Cicco, 938 F.2d at 444. In Cicco , we considered whether S 666 is sufficiently broad to cover the solicitation of election day services in exchange for municipal employment.8 On appeal, we recognized that the statutory language could be construed literally to cover Cicco's conduct, but found that "the language of the drafters of S 666 is also consistent with an intention of focusing solely on offenses involving theft or bribery" in a classic sense. Cicco, 938 F.2d at 444. Thus, we found that the statute was ambiguous and turned to the legislative history. Id.9

_____

8. The District Court entered a judgment of acquittal in Cicco after determining that Congress did not intend S 666 to apply to Cicco's actions and that the government's interpretation of the statute was unconstitutionally vague and deprived Cicco of fair notice. Id. at 444.
9. In outlining our approach in Cicco, we stated that examining the reach of a federal criminal statute requires close attention to statutory language, legislative history, and purpose to strictly determine the scope of forbidden conduct. Id. (citing Dowling v. United States, 473 U.S. 207, 213 (1985)). We learned through our legislative history review in Cicco that Congress enacted S 666 to "protect federal funds by authorizing federal prosecution of thefts and embezzlement from programs receiving substantial federal support even if the property no longer belonged to the federal government . . . [and] to enlarge and clarify the class of persons subject to the federal bribery laws" to go beyond only those who can be considered federal public officials. Cicco, 938 F.2d at 445 (citations omitted).

As in Cicco, we now face a choice between a highly literal interpretation -- that no federal interest requirement is specifically set forth in the statute -- and a plausible, albeit more contextual, alternative. Thus, as in Cicco, we will refer to the legislative history for assistance in determining what Congress intended. See Collinsgru, 161 F.3d at 233.10

The legislative history of S 666 explains that the statute was enacted to correct deficiencies in existing law by "creat[ing] new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." S. REP. NO. 98-225, 369- 370 (1984) (emphasis added), reprinted in 1984

_____

10. Examination of and references to the legislative history are not uncommon among the decisions that analyze S 666. The Supreme Court in Salinas referred to Congress' intentions in enacting S 666, although it did not review or cite Congressional reports directly. See Salinas, 118 S. Ct. at 474 (recounting Congress's intent in enactingS 666 based on a "chronology [of case law] and the statutory language" and rejecting Salinas' interpretation of the legislative history). See also Bonito, 57 F.3d
at 172 (citing legislative history noted by Bonito and ultimately rejecting
Bonito's arguments); Valentine, 63 F.3d at 463 (reviewing legislative history to determine whether it supported Valentine's argument); Westmoreland, 841 F.2d at 576-577 (reviewing legislative history " `as an additional tool of analysis' with the recognition that our inquiry will result in `a limitation on the plain meaning of the statutory language' only under exceptional circumstances") (quoting Garcia v. United States, 469 U.S. 70, 75 (1984)); Frega, 933 F. Supp. at 1542-1543 (reviewing legislative history after finding statute ambiguous because interpretation not requiring federal connection would alter federal-state balance absent a clear Congressional directive). Courts interpreting subsection (b) have followed a similar course. See United States v. LaHue, 170 F.3d 1026, 1030 (10th Cir. 1999) ("Like other courts that have wrestled with an interpretation of section 666(b), we look to the legislative history and the
underlying purpose of the statute for guidance"); United States v. Copeland, 143 F.3d 1439, 1442 (11th Cir. 1998) (having reached the conclusion on a "plain reading of S 666(b), we normally would not engage in any additional analysis. However, since some circuits have found S 666(b) to be ambiguous on its face, it is worth noting that our conclusion is consistent with the statute's legislative history."); Coyne, 4
F.3d at 109 (reviewing legislative history regarding whether program at issue must be actual recipient of federal funds).

16

U.S.C.C.A.N. 3182, 3510-11. A similar expectation is reflected in the stated purpose of the statute, described as protecting the integrity of vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery. Indeed, the title of the relevant section of this portion of the legislative history, "Program Fraud and Bribery," suggests that Congress envisioned that a federally funded program would be the target or victim of the corrupt activity punishable under S 666.

There is no doubt that the legislative history promotes a broad interpretation of the term "Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance" to supplement the application of federal bribery and theft statutes. S. REP. NO. 98-225, 369-370. However, those gaps to be filled by this statute relate to elements in the federal bribery and theft statutes that increased the difficulty of reaching crimes in which there was a real federal interest. Under the theft of federal property statute, 18 U.S.C. S 641, the federal government could prosecute only when it could establish that the stolen property was property of the United States, which often was impossible if title had passed before the property was stolen or when federal funds were so commingled with non-federal funds that the federal character of those funds could not be shown. Perhaps more relevant for our purposes was the federal bribery statute, 18 U.S.C. S 201, which was construed to be inapplicable to some or all employees of private organizations receiving federal funds, making it more difficult for federal authorities to prosecute bribery even when federal interests were at stake. The goal was to overcome impediments to reaching actions in which there was a federal interest, not to federalize crimes in which a federal interest was lacking.

Not surprisingly, the Senate Report notes that the intent of the statute is "to reach thefts and bribery in situations of the types involved in the Del Toro, Hinton, and Mosley cases cited herein," three cases in which the corrupt transaction clearly implicated federal interests. S. REP. No. 98-225, 369-370. In United States v. Del Toro, 513 F.2d 656 (2d Cir. 1975), the defendants conspired to bribe Pedro

17

Morales, the Assistant Administrator of the Harlem-East Harlem Model Cities Program, a program that wasfinanced and supervised by the United States Department of Housing and Urban Development ("HUD"). The federal government paid one hundred percent of the cost of the program, and eighty percent of its salaries, including Morales's salary. Id. at 658, 661. The defendants wanted Morales to use his position with the program to secure Model Cities an office space lease in a building for which one of the defendants was the rental agent. Id. at 658. Because Morales was a city employee, and not a federal one, however, the Second Circuit Court of Appeals concluded that Morales was not a "public official" for purposes of S 201: "We do not believe that Morales was acting `under or by authority of any such department, agency, or branch' of the federal government. He was a city employee, carrying out a task delegated to him by his superior, another city employee." Id. at 662. Yet, the federal interest in Morales' corrupt transaction is apparent: the bribed official administered a program significantly funded by federal monies and the bribe was related to the program administered by the official.

In the other two decisions cited in the Senate Report, the Seventh Circuit determined that non-federal employees could be considered "public officials" for purposes of S 201, but this decision turned on the fact that the defendants exercised considerable discretion in the administration of federal funds and the bribery related to the defendant's administration of the program, which for our purpose suggests that a federal interest clearly was implicated. See United States v. Hinton, 683 F.2d 195, 198-200 (7th Cir. 1982); United States v. Mosley, 659 F.2d 812, 816 (7th Cir. 1981). In Hinton, the defendants were officials of United Neighborhoods, Inc., a non-profit corporation that had entered into a contract with the City of Peoria to administer funds that HUD awarded to Peoria. The defendants had discretion in administering the federal funds, and the federal funds paid the defendants' salaries and the entire cost of the program they administered. Significantly, the bribery related to rehabilitation contracts that fell within

the purview of the program and were paid with federal funds. Hinton, 683 F.2d at 196-99.11

In Mosley, the defendant, an employee of the State of Illinois Bureau of Employment Security ("IBES"), was convicted of receiving bribes in exchange for giving preferential treatment to Comprehensive Employment and Training Programs Act ("CETA") applicants when he evaluated and referred applicants for CETA-funded jobs. Mosley, 659 F.2d at 813. The federal government funded the CETA program, the CETA jobs, and all of IBES's costs, including Mosley's salary. Id. As in Hinton, the defendants could be considered public officials because the program in Mosley was funded by the federal government, the defendant exercised discretion in the administration of federal funds, and the bribery related to the defendant's administration of the program. Again, the federal interest is clear.

The Senate Report's examples of intended S 666 offenses involved situations in which the corrupt acts clearly implicated a federal interest, as the acts were closely tied to the funded programs.12 Another comment in the Senate

_____

11. In affirming Hinton, the Supreme Court determined that individuals employed by private organizations that receive federal funds may be covered by S 201, at least if an individual possesses "some degree of official responsibility for carrying out a federal program or policy." Dixson
v. United States, 465 U.S. 482, 499-500 (1984). In limiting the parameters of its holding, however, the Supreme Court cautioned:

> By finding petitioners to be public officials within the meaning of
> section 201(a), we do not mean to suggest that the mere presence of
> some federal assistance brings a local jurisdiction and its employees
> within the jurisdiction of the federal bribery statute or even that all
> employees of local organizations responsible for administering
> federal grant programs are public officials within the meaning of
> section 201(a). To be a public official under section 201(a), an
> individual must possess some degree of responsibility for carrying
> out a federal program or policy . . . individuals who work for block
> grant recipients and business people who provide recipients with
> goods and services can not be said to be public officials under
> section 201(a) unless they assume some duties of an official nature.

Id. at 500.

12. See also LaHue, 170 F.3d at 1031 ("In all three cases [Del Toro, Hinton, and Mosley], the organization in question received federal

19

Report illustrates that an entity's receipt of federal funds does not automatically establish a federal interest in corrupt activity of employees of that entity:

> For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a Federal crime.

S. REP. NO. 98-225, 370. Thus, nothing in the legislative history suggests that Congress intended to go well beyond the examples in Del Toro, Hinton, and Mosley to make S 666 applicable when no federal interest is implicated by certain offense conduct.

Not only does the legislative history of S 666 lead us to conclude that the statute should be read to incorporate a federal interest requirement, but several well-established principles of statutory construction dictate this result. According to the Supreme Court, ambiguity in the language of a criminal statute should be resolved in favor of the defendant. See United States v. Bass, 404 U.S. 336, 347 (1971) ("In various ways over the years, we have stated that `when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.' ") (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22 (1952)). Congress has not "clearly and definitely" instructed thatS 666 should be applied even absent some federal interest in the offense conduct. We should refuse the broader reading urged by the government and adopt the narrower construction of the activity criminalized by this provision. See also LaHue, 170 F.3d at 1029 (in evaluating another subsection ofS 666, "we must exercise particular restraint in interpreting federal criminal statutes") (citing Dowling, 473 U.S. at 214).

_____

program funds as the intended recipient, and each was charged with the responsibility for administering or spending the federal grant monies to benefit the intended beneficiaries.").

The Supreme Court also has instructed us that we should not interpret a statute in a manner that significantly alters the federal-state balance unless Congress has clearly indicated that it intended to do so. See Bass, 404 U.S. at 349 ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."); see also McCormack, 31 F. Supp.2d at 186-187; Frega, 933 F. Supp. at 1540 (citing Bass). If we adopted the government's interpretation that S 666 requires no connection between the offense conduct and federal funds or programming, S 666 would criminalize a host of corrupt acts committed by state agents, among others, by virtue of the fact that all states receive at least $10,000 in federal funds per year. See McCormack, 31 F. Supp.2d at 186. This result raises significant federalism concerns, turning traditionally local conduct into a matter for federal enforcement involving a substantial extension of federal law enforcement resources. See Bass, 404 U.S. at 350. We will not transform S 666 into a general federal anti-corruption statute when Congress has not clearly expressed its intention to do so. See McCormack, 31 F. Supp.2d at 186 (expressing concern about adopting government's interpretation); Frega, 933 F. Supp. at 1540. As the Supreme Court stated in Bass, "consistent with our regard for the sensitive relation between federal and state criminal jurisdiction, our reading preserves as an element . . . a requirement suited to federal criminal jurisdiction alone." 404 U.S. at 351.13

_____

13. In interpreting the illegal gratuity statute, 18 U.S.C. S 201(c)(1)(A),
Justice Scalia stated for an unanimous Court that"a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel
should reasonably be taken to be the latter. Absent a text that clearly requires it, we ought not expand this one piece of the [illegal gratuity] regulatory puzzle so dramatically as to make many other pieces misfits." United States v. Sun-Diamond Growers of California, ___ U.S. ___, 119 S. Ct. 1402, 1410 (1999) (holding that S 201(c)(1)(A) requires that the government prove a link between a thing of value conferred upon a public official and a specific official act for or because of which it was given). We point out, however, that SS 201 and 666 are not necessarily parallel in their applications, so these remarks do not dictate a substantive outcome here. See United States v. Jennings, 160 F.3d 1006, 1015 fn 4 (4th Cir. 1998) (outlining distinctions between application of two provisions but not deciding whether S 666, like S 201, prohibits gratuities).

Finally, when a statute is unclear, we will construe it so as to avoid constitutional concerns, assuming that such construction does not amount to a rewriting of the statute. See Albertini, 472 U.S. at 680. InterpretingS 666 to have no federal interest requirement produces serious concerns as to whether Congress exceeded its power under the Spending Clause in enacting this statute. See McCormack, 31 F. Supp.2d at 187-89.14 To pass muster under the Spending Clause, legislation regulating behavior of entities receiving federal funds must, among other things, be based upon a federal interest in the particular conduct. See South Dakota v. Dole, 483 U.S. 203, 207 (1987). Applying S 666 to offense conduct, absent evidence of any federal interest, would appear to be an unconstitutional exercise of power under the Spending Clause.

Thus, we hold that S 666 requires that the government prove a federal interest is implicated by the defendant's offense conduct. In so holding, we part ways with the Sixth Circuit's holding in Dakota and agree with the result reached by the Second Circuit, as expressed most recently in Santopietro, and the District Court for the Southern District of California in its pre-Salinas Frega decision.

Given that the Supreme Court found a sufficient federal connection existed in Salinas, we surmise that a highly attenuated implication of a federal interest will suffice for purposes of S 666.15 We can conceive of several ways in which the government could prove a federal interest in a S 666 in light of this threshold. The amount of federal funds could provide the requisite federal implication, even if the purpose of those funds has no explicit relationship to the subject of the bribe. If, for example, in a given year, the

_____

14. According to the Second Circuit, "Salinas may be read to indicate that the `threat to the integrity and proper operation of [a] federal program' created by the corrupt activity is necessary to assure that the statute is not unconstitutionally applied." Santopietro, 166 F3d at 93 (citing Salinas, 118 S. Ct. at 475).

15. In Salinas, the Supreme Court found that the federal government's interest in the housing of federal prisoners in federally-funded local facilities was sufficiently implicated when a prison official accepts bribes
from a federal prisoner in exchange for permitting the prisoner to have conjugal visits. See Salinas, 118 S. Ct. at 474.

greater part of a township's budget came from federal funds, bribery of a township agent for any purpose might be said to implicate federal interests. Absent that situation, the offense conduct would have to somehow implicate a particular substantive federal interest, as the Supreme Court found it did in Salinas, where federal funds were being provided to house federal prisoners in local prisons.

Examples from other cases may be illustrative. The Second Circuit found a sufficient federal connection in Santopietro when real estate developers made corrupt payments to defendants to secure defendants' influence with city agencies overseeing housing and urban development programs that were the beneficiaries of federal funds. See Santopietro, 166 F.3d at 93 – 94. The Second Circuit concluded that "this is not a case where the transactions sought to be influenced concerned one department of a city and the requisite $10,000 of federal funds were received by a totally unrelated department." Id. However, the Court noted that the federal interest requirement "would not permit the Government to use section 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000." Id., at 93.

The District Court in Frega concluded that bribing state court judges to influence decisions in certain cases did not produce the requisite federal interest when California received federal funds for purposes not related to the state courts. See Frega, 933 F.Supp. at 1542 – 1543. The Court hypothesized, however, that some circumstances involving state court judges might produce the requisite federal connection, such as if the state court system received federal funding for the purpose of appointing counsel in death penalty habeas proceedings, and a state court judge accepted a bribe in exchange for appointing a particular attorney as habeas counsel. See id.

There was evidence at Zwick's trial revealing that the federal funds were provided to Ross Township for reimbursement for emergency snow removal and funding of a project to prevent stream bank erosion.16 These uses bear
_____

16. The government presented proof that Ross Township received in excess of $10,000 in federal funds in a one-year period from two

23

no obvious connection to Zwick's offense conduct, which involved sewer access, use permits and landscaping performance bonds. However, we will not direct the entry of a judgment of acquittal because the District Court ruled that S 666 did not require, and thus the government need not present proof, that Zwick's conduct implicated a federal interest.[17] Instead, we will vacate Zwick's conviction and remand for a new trial.

IV.

Zwick raises several other challenges to his S 666 conviction that we find to be without merit. In connection with the conduct charged in count one, Zwick argues that there was insufficient evidence establishing that he acted as an agent of an entity that received the requisite amount of federal funds as S 666 requires. Zwick contends that the evidence presented at trial shows that Zwick was acting as an agent of Lowries Run, not as an agent of Ross Township. The government's theory at trial was that Zwick had offered to obtain sewer access for Kaclik in his capacity as an

_____

sources. First, Ross Township applied for federal reimbursement under a Presidential Declaration of Major Disaster for costs associated with the blizzard of 1996 and consequently received $30,587 in June of 1996 from the Federal Emergency Management Agency ("FEMA"). The funds first flowed through the Pennsylvania Emergency Management Agency ("PEMA"), but they were segregated from other Commonwealth funds prior to distribution to Ross Township. Second, the United States Army Corps of Engineers carried out and funded a $326,200 project, to which Ross Township contributed $65,300, to prevent the erosion of a stream bank in Ross Township.

17. At a pretrial conference, counsel discussed with the District Court whether S 666 requires a showing of a federal interest in Zwick's conduct. Counsel for the government informed the District Court that "there are crucial issues as to what would be admissible and arguable at trial that turn on what the jury instructions that you issue will be. For example, we would need a determination on whether there does or does not need, as we maintain, need to be a nexus between the bribe and receipt of federal funds by Ross Township." App. 269. In response, the District Court stated at least twice that "there doesn't have to be any relationship." App. 270, line 9, App. 271, lines 3-4.

24

agent of Ross Township, not of Lowries Run, and the government did not offer any proof that Lowries Run received federal funds. Zwick concludes that his conviction on count one should be reversed.

Under S 666(b), the government must establish that at least $10,000 in federal funds within a one-year period were received by the entity for which the defendant was acting as an agent. A defendant advancing a claim based on insufficiency of the evidence carries a heavy burden, as we apply a particularly deferential standard in reviewing this type of claim. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998). We do not weigh the evidence or determine the credibility of the witnesses. Id. Rather, viewing the evidence in the light most favorable to the government, we will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.

The Lowries Run Sanitary Authority ("Lowries Run") is a joint venture between Ross Township and the McCandless Township Sanitary Authority; two of the members of its governing board are appointed by Ross Township, and two are appointed by McCandless Township. Lowries Run board members need not be commissioners from Ross Township. Zwick was selected as a member of the Lowries Run board, but not in his capacity as a Ross Township commissioner. Lowries Run operates independently from Ross Township; it has its own bank account that is administered by the McCandless Sanitary Authority, and money that it receives belongs to Lowries Run, not Ross Township.

At trial, Kaclik testified that he could have applied to either Ross Township or Lowries Run for sewer access for his project, Shannopin Square II. Kaclik testified further that he understood that, in exchange for his money, Zwick would influence Ross Township to approve Kaclik's sewer access application; although he had the option of tapping into either the Ross Township or the Lowries Run sewer system, he preferred the Township option because it was less expensive. App. 732, 758-59. Thomas D. Lavorini, Manager of Ross Township, testified that he believed Kaclik approached Ross Township about obtaining access to the Ross Township sewer line, and that Lavorini may have had

25

a discussion with Zwick about Kaclik's request. App. 658–59. Kaclik also testified that Zwick had told him he would obtain the necessary Republican and Democratic votes and that Zwick cashed Kaclik's check so that the Township would not know the source of the money. App. 733, 740–41. Both of Zwick's comments suggest Zwick was offering to deal with the Township, and not Lowries Run, on Kaclik's behalf.

The substance of Kaclik's testimony suggests that he had some confusion regarding the difference between the Township and Lowries Run, and there was documentary evidence that the only formal application Kaclikfiled was with Lowries Run. App. 751–52, 761–62. However, assuming a jury found Kaclik and Lavorini credible, this evidence is not so compelling that it could have prevented a jury from finding, based on the evidence before it, that Zwick was acting as an agent of Ross Township during the sewer access transactions. Thus, we reject Zwick's argument.

With respect to count two, Zwick also argues that the government failed to establish that Zwick intended to be influenced "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." See 18 U.S.C. S 666(a)(1)(B) (emphasis added). According to Zwick's interpretation of S 666, the transaction or transactions must be worth at least $5,000 to Ross Township, not to the other entities involved. He also claims that the transactions involved in count two were not worth $5,000 or more as S 666 requires, but rather worth only $700, the cost of the conditional use permit and thefinal site plan that Zwick offered to help the Fosnights obtain.

First, we disagree with Zwick's reading of the statute regarding valuation of the $5,000 element. We find that the plain language of the statute does not require that value be measured from the perspective of the organization, government, or agency. See 18 U.S.C. S 666(a)(1)(B) (prohibiting bribery "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more" (emphasis added)); see also Santopietro, 166 F.3d

26

at 93 ("there is no requirement that the corrupt transactions are worth $5,000 or more to the entity receiving the federal funds"); United States v. Marmolejo, 89 F.3d 1185 (5th Cir. 1996)[18] (finding that the $5,000 value element was designed to limit application of S 666 to significant corrupt transactions, not to restrict the manner in which or the perspective from which that value is to be calculated). See also United States v. Apple, 927 F. Supp. 1119, 1126 (N.D. Ind. 1996) (concluding that the government is not required "to show that the thing that held value of over $5,000 held that value for" the entity); United States v. Vona, 842 F. Supp. 1534, 1536 (W.D.N.Y. 1994) (finding that the Act does not require that the defendant gain $5,000 or that the victim lose $5,000, but that "as long as the overall transaction or the target of the bribe is valued at $5,000 or more, the element of the crime is satisfied"); United States v. Mongelli, 794 F. Supp. 529, 530 (S.D.N.Y. 1992) ("The $5,000 triggering provision should thus be interpreted as intended to require that substantial matters of that actual value be involved, not that the agency be at risk of losing that amount.").[19]

Second, we reject Zwick's argument that the transactions at issue were worth less than $5,000. Significantly, the Fosnights agreed to pay Zwick $15,000 for his assistance, which indicates that the value of the transactions was well

_____

18. In Marmolejo, defendant local officials agreed to provide a prisoner with conjugal visits in exchange for $6,000 a month and $1,000 for each visit. Id. at 1191. To value the transactions at issue, the Court looked to "traditional valuation methods," specifically, what a person in the marketplace would be willing to pay for the transaction. Id. at 1193.

19. We also reject Zwick's argument that we should follow the Second Circuit in requiring that the value be determined from Ross Township's perspective. For this argument, Zwick relies on the Second Circuit's ruling in Foley that the transaction must be valued from the perspective of the entity receiving the funds. Foley, 73 F.3d at 493. Regardless of the merits of Zwick's claim, the Second Circuit has since abandoned that construction. See Santopietro, 166 F.3d at 93 ("[T]o the extent that Foley required the Government to plead and prove that the transaction involved something of value to the governmental entity that received the requisite amount of federal funds, that narrowing construction of the statute must . . . be discarded."). Thus, Zwick's reliance on Foley is misplaced.

27

above $700 and the $5,000 minimum. App. 424 – 425. See Marmolejo, 89 F.3d at 1194 (finding that the value of the conjugal visits was more than $5,000, because the prisoner was willing to pay $6,000 a month plus $1,000 per visit for them). There was evidence at trial that the Fosnights would have lost the $10,000 they paid to the owners of the property had their conditional use permit not been approved. App. 420–21, 465. The overall value of the Fosnight project was $4.6 million, and Ross Township would receive $90,000 in tax benefits from the project on a yearly basis, as well as $6,939 in permit fees before the project could go forward. App. 439, 442. The Fosnight project was clearly a significant transaction within the intended reach of the statute. Because we believe that there was substantial evidence from which the jury could have found that the $5,000 element was satisfied, we reject Zwick's challenge to the calculation of value under S 666 with respect to count two.

We also are not persuaded by Zwick's argument, applicable to all counts, that the District Court improperly instructed the jury that the future value of the transaction can be taken into account. Zwick cites the Sixth Circuit's decision in Valentine that the government could not aggregate the values of numerous thefts that occurred over a three-year period in order to meet the $5,000 threshold under S 666(a)(1)(A), the theft provision. See Valentine, 63 F.3d at 464. Valentine is simply inapposite. Under the theft provision, the stolen property must be worth $5,000, while the bribery provision looks to the value of the underlying business or transaction. Compare 18 U.S.C.S 666(a)(1)(A) (prohibiting theft of "property that . . . is valued at $5,000 or more") with 18 U.S.C. S 666(a)(1)(B) (prohibiting bribery "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more"). Further, unlike in Valentine, the government in this case did not attempt to proffer evidence of the value of transactions or business outside of the statutory period in order to satisfy the $5,000 threshold. Here, the references to Ross Township's future revenues from the transactions were actually evidence of their current value. Even without reference to future revenues, there is substantial evidence

28

establishing that the present value of the transactions and business involved in each of counts one, two, and three was at least $5,000. The sewer taps that Zwick offered to obtain for Kaclik were clearly worth more than $5,000, as Kaclik was willing to pay $17,500 to ensure that he received them; the contracts that were the subject of the bribery at count three were worth $45,000; and the permits in count two were worth more than $5,000 to the Fosnights, because, as detailed above, they were willing to pay Zwick $15,000 to ensure that they received them and would have lost $10,000 if they did not receive them in a timely manner.

V.

Zwick's final contention is that the District Court erred in failing to award him an additional point reduction in his offense level for acceptance of responsibility pursuant to U.S.S.G. S 3E1.1(b). We give great deference to the District Court's evaluation of the defendant's acceptance of responsibility, but exercise plenary review of the Court's construction of S 3E1.1. See United States v. Ceccarani, 98 F.3d 126, 129 (3d Cir. 1996). We review the District Court's determinations of fact for clear error. Id.

Section 3E1.1 provides:

> (a) If the defendant clearly demonstrates acceptan ce of responsibility for this offense, decrease the offense level by 2 levels.

> (b) If the defendant qualifies for a decrease un der subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more the following steps:

> (1) timely providing complete information to the government concerning his own involvement in the offense; or

> (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and

29

> permitting the court to allocate its resources efficiently,
>
> decrease the offense level by 1 additional level.

The District Court awarded Zwick the two-point reduction provided in S 3E1.1(a). At issue here is the Court's rejection of the one-point reduction under S 3E1.1(b). Section 3E1.1(b) focuses on the timeliness of a defendant's offer of information or notice of intent to plead such that the defendant provides an opportunity to the government and court to conserve resources. See U.S.S.G. S 3E1.1, App. Note 6 ("For example, to qualify under subsection (b)(2), the defendant must have notified authorities of his intention to enter a plea of guilty at a sufficiently early point in the process . . . ."); United States v. Narramore, 36 F.3d 845, 847 (9th Cir. 1994) ("The additional reduction in section (b) with which we are concerned, is unlike the initial reduction in section (a), for it does not rest upon the demonstration of contrition. Section (b) allows the defendant to earn an additional reduction by providing timely notice of his intention to plead guilty, and it thus creates an incentive for an early plea").

Parsing section 3E1.1(b), it directs the sentencing judge to decrease the offense level by one additional level if 1) the defendant is entitled to the two-point reduction under S 3E1.1(a); 2) the defendant's offense level is 16 or greater; and 3) the defendant satisfies either of the two requirements provided in subparagraphs (b)(1) and (b)(2). See United States v. Paster, 173 F.3d 206, 214-15 (3d Cir. 1999).

Zwick clearly satisfied the first two conditions under subsection (b), in that he was awarded the two-point reduction under S 3E1.1(a), and had an offense level of 22.[20]

---

20. Although the government argues in its brief that "it is difficult if not impossible, to find acceptance of responsibility in Zwick's pretrial and trial conduct," see Brief for Appellee at 53, we limit our discussion to whether Zwick satisfied either subparagraph (1) or (2) of S 3E1.1(b) because acceptance of responsibility is not the element at issue in this appeal and we assume it will be satisfied even after remand. In addition,

30

However, the District Court adopted the Probation Office's conclusion that Zwick was not entitled to the extra point under subsection (b) because the government was required to prepare for trial,21 noting also that defendant made factual arguments at trial.22

We believe that the District Court did not fully consider the elements of subsection (b). To receive an additional reduction for timely providing complete information to the government, subparagraph one of S 3E1.1(b) requires that the defendant timely provide complete information; it does not require, either expressly or impliedly, that the defendant actually forego his trial. See S 3E1.1(b)(1) (providing for a reduction for a defendant for "timely providing complete information to the government concerning his own involvement in the offense"). Instead of concluding that the one-point deduction was foreclosed

_____

we also assume that, even after remand, Zwick's offense level will be at level 16 or greater as subsection (b) requires. Although Zwick's offense level may change if the District Court determines on remand that the judgment on the S 666 counts is to be vacated, the offense level for the fraud counts alone is 17, which satisfies the second requirement of S 3E1.1(b) that Zwick's offense level be 16 or higher.

21. The Probation Office, in its Presentence Investigative Report ("PSR") found:

> The defendant entered a guilty plea to Counts 4, 5, 7, 8, 9, and 10 of the indictment. Ostensibly, he chose to go to trial over the remaining counts of the indictment, believing he should not have been charged with those offenses in federal court, instead that he should have been charged in state court. During the presentence interview, he admitted his conduct in all of the charged counts was illegal. The government was, therefore, required to prepare for trial
> in this matter. In view of this, only a two-point reduction for acceptance of responsibility is warranted.

PSR P 75.

22. Specifically, the District Court noted that the defendant's opening statement informed the jury that the government had to prove defendant's intent, and that defendant cross-examined Tim Fosnight as to the defendant's voting activities at a Ross Township Planning Commission hearing on the approval of a conditional use permit for the Fosnights' project in an effort to require the government to prove intent.

31

simply because the government prepared for trial, the District Court should have considered whether Zwick timely provided complete information as the Guideline requires.

Likewise, subparagraph two of S 3E1.1(b) requires that the defendant express his notice of intent to plead guilty early enough to permit the court and government to conserve resources, not that a guilty plea be entered in a timely fashion or that the reduction is unavailable if the case proceeds to trial. See S 3E1.1(b)(2). Permitting the government and court to conserve resources, see WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 876 (defining "permit" as "[t]o afford opportunity"), is not synonymous with the actual conservation of resources. We recognize that other courts, such as the Seventh Circuit Court of Appeals, require actual conservation of resources as a condition to receiving the point deduction under subsection (b)(2). See United States v. Wilson, 134 F.3d 855, 872 (7th Cir. 1998) ("courts are still required to consider whether this expressed intent actually resulted in conserving Government and court resources."). However, we believe that our reading is true to the plain language of the Guideline and comports with the underlying purpose the Guideline serves. This Guideline rewards the defendant's willingness to acknowledge responsibility for criminal wrongdoing in lieu of requiring all allegations to be proved in a trial. As such, the Guideline is triggered by the defendant's behavior, not by whether other factors out of the defendant's control prevent the acceptance of the defendant's plea. Surely the possibility of an extra point reduction is not necessarily foreclosed, for instance, by the government's rejection of a plea, for whatever reason. The government's refusal to accept the plea and to avail itself of the opportunity to conserve resources is not a per se barrier to the one-point deduction. If the drafters of the Guideline intended to limit the award of the point to situations in which a plea was entered, or resources were actually conserved, they could have crafted the language to reflect this intention.

We recognize that conditional pleas raise unique issues, which need to be evaluated on a case-by-case basis. 23 We

_____

23. See United States v. Rogers, 129 F.3d 76, 80-81 (2d Cir. 1997) (finding that conditional offer to plead guilty did not come early enough

32

also acknowledge that it may be a rare case in which anything short of a timely entry of a guilty plea suffices for purposes of S 3E1.1(b).24 However, because the District

Court did not fully address, let alone resolve, whether Zwick's pre-trial activity entitled him to a reduction under the specific terms of S 3E1.1(b), we will remand to the District Court for consideration of whether Zwick timely provided complete information to the government under S 3E1.1(b)(1), or if his expression of his intent to plead

_____

in the proceedings to satisfy S 3E1.1(b)(2) because it came after the case was "effectively tried" with the motion to suppress); United States v. Gonzales, 19 F.3d 982, 983–84 (5th Cir. 1994) (refusing to award an additional point because Gonzales never entered an actual guilty plea; the suppression hearing to which Gonzales wished to preserve a challenge in his guilty plea was the equivalent of a full trial, requiring full preparation and expenditure of resources by the government and the court).

24. See United States v. Morillo, 8 F.3d 864, 872 (1st Cir. 1993) ("A defendant who withholds a guilty plea until he stands poised on the brink of trial has no entitlement to the soothing unguent of section 3E1.1(b)(2). Therefore, the court below acted appropriately in awarding appellant a two-level, rather than a three-level, decrease for acceptance of responsibility"); Narramore, 36 F.3d at 846–47 (holding that defendant was not entitled to a reduction under S 3E1.1(b)(2) because he could have informed government of intention to plead guilty, even though he was waiting to actually plead guilty until after the court ruled on his motion to suppress); United States v. Villasenor–Cesar, 114 F.3d 970, 975 n.4 (9th Cir. 1997) ("Like Narramore, Villasenor–Cesar could have preserved the availability of the subsection (b)(2) adjustment if, instead of pursuing a stipulated-facts trial, he had notified authorities of his intent to plead guilty if the district court ruled against him on his motion to dismiss the indictment."); United States v. Covarrubias, 65 F.3d 1362, 1368 (7th Cir. 1995) ("Because defendant made no attempt to conserve government and district court resources in his case prior to November 7, the district court did not clearly err in denying him the additional reduction" when defendant did not plead guilty until the day of trial, and did not inform the government that he would be pleading guilty in the event that the motion to suppress, which was decided on the morning of trial, was denied); United States v. Williams , 74 F.3d 654, 657 (5th Cir. 1996) (agreeing with Covarrubias).

guilty was sufficiently timely under S 3E1.1(b)(2) to permit the conservation of government and court resources. 25

VI.

For all of the foregoing reasons, we will remand this matter to the District Court for a new trial. We also will vacate the District Court's sentencing decision denying the additional one-point reduction under S 3E1.1(b), and remand to the District Court so that it may determine if Zwick is entitled to a reduction under S 3E1.1(b) for timely providing information to the government, or timely offering notice of intent to plead guilty. We reject Zwick's other contentions, and will affirm as to those issues.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
_____

25. We also find that the fact that Zwick made legal arguments at trial is inapposite with respect to S 3E1.1(b). Application Note two provides that a defendant may be entitled to a reduction even if he goes to trial, if he does so to "assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge
to the applicability of a statute to his conduct)." Although the note does not explicitly provide that it applies only to S 3E1.1(a), a logical reading
of the note compels this conclusion. The note espouses the principle that a defendant may in some circumstances show contrition even if he proceeds to trial; this has little to do with the timeliness of a defendant's
offer of information or expression of intent to plead guilty, the focus of S 3E1.1(b). See Villasenor-Cesar, 114 F.3d at 974. In addition, the note is essentially a continuation of Application Note 1, which applies to subsection (a).

34