UNITED STATES of America,
Plaintiff,

v.

Lawrence W. WRIGHT, Defendant.

No. CRIM.A.01–63–RRM.

United States District Court,
D. Delaware.

June 14, 2002.

Colm F. Connolly, United States Attorney and Richard G. Andrews, First Assistant United States Attorney, United States Department of Justice: United States Attorney's Office, Wilmington, Delaware; counsel for United States.

Stephen B. Potter, and Jennifer Kate Aaronson, Potter, Carmine & Leonard, P.A., Wilmington, Delaware; counsel for defendant, Lawrence Wright.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a criminal case. The defendant Lawrence W. Wright was charged with a nineteen count indictment that included charges of conspiracy, interstate transpor-

tation of stolen property, money laundering, bribery, and making false statements to government officials. The charges alleged that Wright, the Reverend at the New Mount Olive Baptist Church, and the now-deceased State Representative Al O. Plant conspired to steal money from the Suburban Street Funds in a scheme where Representative Plant allocated approximately $150,000 of Suburban Street Funds to Wright's church. In connection with the Suburban Street Funds program, Plant, like other State of Delaware legislators, had discretionary authority to distribute his allocated Suburban Street Funds to qualifying projects in his district.[1] Wright then drew the money from the church account, and deposited half of the funds into his personal account and the other half of the funds into the personal account of Representative Plant. After a jury trial, in which he was convicted on all nineteen counts, Wright filed post-trial motions for a new trial on the interstate transportation of stolen property counts pursuant to Rule 33 and for acquittal on the conspiracy, money laundering, and bribery counts pursuant to Federal Rule of Criminal Procedure 29(c).

In his motion for a new trial, Wright asserts that a new trial should be granted on the interstate transportation of stolen property counts because the court improperly excluded relevant evidence relating to Plant.

In his motion for judgment of acquittal, Wright first contends that he is entitled to a judgment of acquittal on the money laundering charges and conspiracy charges. He contends that there was no evidence that Wright had any knowledge that the checks that formed the basis of the predicate interstate transportation of stolen property counts were going to travel in interstate commerce and that proof of such knowledge is required to convict him of the money laundering and conspiracy charges. Wright also contends that he is entitled to a judgment of acquittal on the bribery charges, because there was no evidence that his offense conduct (i.e., the bribery) implicated a "federal interest" and such proof is required to convict him of the federal bribery charges under applicable Third Circuit precedent.

This is the court's decision on Wright's post-trial motions. For the reasons set forth below, the court will deny Wright's motion for a new trial, will deny Wright's motion for judgment of acquittal as to the money laundering and conspiracy charges, but will grant Wright's judgment of acquittal as to the bribery charges.

## I. PROCEDURAL HISTORY

On September 25, 2001, the Grand Jury returned a nineteen-count indictment against the defendant, Lawrence Wright. Count I of the indictment alleged that Wright conspired to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. Counts II through IV charged Wright with the interstate transportation of stolen property in violation of 18 U.S.C. § 2314 and § 2. Counts V through VIII alleged that Wright laundered monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 2. Counts IX through XVII charged

---

1. While the Suburban Street Funds were to be used for transportation related projects, through contracts between the Delaware Department of Transportation and the City of Wilmington, legislators whose district included the City could choose to give their Suburban Street Funds directly to the City.

In return, the City set up accounts with an identical amount of money, which the legislators could use to distribute to civic and charitable organizations of their choosing, such as churches and non-profit organizations.

Wright with bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(2) and § 2 (Counts IX–XVII). Last, Counts XVIII and XIX charged Wright with knowingly and willfully making a false statement in connection with a matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, in violation of 18 U.S.C. § 1001.

On October 25, 2001, Wright moved to dismiss Counts I through XVII of the Indictment. Wright argued that Counts I through VIII (the conspiracy, interstate transportation of stolen property, and money laundering counts) were insufficient for failure to charge that Wright acted "willfully" in transporting stolen property in interstate commerce, because they did not charge that Wright knew the checks (i.e. the stolen property) that he deposited into the bank were going to be transported in interstate commerce. Wright deposited the checks in the Wilmington, Delaware branch of Sun National Bank, but, as per bank procedure, the checks were sent to Pennsylvania for "clearing." Wright similarly asserted that the evidence the Government had stipulated it would raise at trial was insufficient to convict him for the interstate transportation of stolen property offenses, because there was no evidence that Wright knew that the checks he deposited into a local bank would be transported in interstate commerce. As the interstate transportation of stolen property offenses were the predicate offenses for the charges of conspiracy and money laundering, Wright argued that those counts must be dismissed as well.

Wright also argued that Counts IX through XVII (the bribery counts) should be dismissed, because, based upon the stipulated record, the Government could not prove that there was a nexus between the charged conduct and federal funds or a federal program, as required by relevant Third Circuit authority. See United States v. Zwick, 199 F.3d 672, 687 (3d Cir.1999) (" § 666 requires the government prove a federal interest is implicated" by the defendant's conduct); United States v. DeLaurentis, 230 F.3d 659, 661–62 (3d Cir.2000) ("For a conviction under § 666 ... the evidence must show some connection between the defendant's bribery activities and the funds supplied by the federal government, or the programs supported by those federal funds").

The court considered Wright's motion to dismiss in a memorandum opinion dated March 22, 2002. See United States v. Wright, 194 F.Supp.2d 287 (D.Del.2002). As to Counts I though VIII the court found that Wright's lack of knowledge as to the interstate nature of his activity was immaterial, because the required state of mind of "wilfulness" does not attach to the interstate transport element of the crime. Id. at 294–95. That element is simply jurisdictional in nature. Thus, proving that the stolen property, which in this case were checks, traveled in interstate commerce is sufficient irrespective of the defendant's knowledge of this travel. Id. Accordingly, the court denied Wright's motion to dismiss the conspiracy, interstate transportation of stolen property, and money laundering counts.

Turning next to Wright's arguments relating to the bribery counts (Counts IX through XVII), the court reviewed the Third Circuit cases of Zwick and DeLaurentis, to establish a framework for determining whether the federal interest requirement of § 666 is met on the facts of this case. In seeking to apply the facts of this case to this legal framework, however, the court found the stipulated facts regarding the details of the federal connection to the Suburban Street Funds inadequate to enable it to resolve whether the

federal interest requirement was met. Accordingly, the court denied Wright's motion to dismiss the bribery counts, and invited Wright to submit post-trial briefing on the issue so that the court could again consider the issue once the factual record has been fully developed. Based on the court's reasoning in its memorandum opinion, the court issued an order denying Wright's motion to dismiss the indictment (D.I.32).

Thereafter, the court held a seven day jury trial from April 16, 2002 to April 24, 2002. At trial, the Government's theory of the case was that Wright conspired with Representative Plant to steal Suburban Street Funds money. Wright bribed Representative Plant to donate money out of his discretionary Suburban Street Funds to Wright's church, by promising to give him kick-backs from the funds that Plant distributed to Wright's church, and then committed interstate transportation of stolen property when the checks from the church account that he deposited to his own account and that of Representative Plant were sent across state lines for "clearing." Wright's action of transferring the funds from the church's account to his own and Representative Plants also constituted money laundering[2]. To prove its case, the Government relied on evidence that showed the following series of events. In response to letter from Wright asking for funding, Plant, using his discretionary authority to allocate the Suburban Street Funds money, directed the City of Wilmington to issue checks to a specific account held by New Mount Olive Baptist Church. Wright, who had authority to write checks on that account, then wrote checks and made wire transfers from the church's account to his account and to Representative Plant's account.

In essence, the defendant's theory at trial was that there was no conspiracy and there was no bribery and that, while Wright had wrongfully taken the money from his church, he had committed no federal crime. Wright admitted that he wrongfully took the money from the church funds to fund he and his wife's gambling habit. As for the payments to Representative Plant, Wright contended that those payments were repayments of cash loans that Plant had given to him and that Plant did not know that the payments were coming out of the Suburban Street Funds that Plant had given to the New Mount Olive Baptist Church.

On April 24, 2002, the jury returned its verdict, finding Wright guilty on all nineteen counts of the indictment.

At the close of the Government's case, Wright moved for Judgment of Acquittal on the charges of bribery, conspiracy, and money laundering. On April 30, 2002, Wright renewed the motion and additionally moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) (D.I.77). On that same date, Wright also moved for a new trial, pursuant to Fed.R.Crim.P. 33, on the grounds that the court erroneously excluded certain evidence at trial (D.I.76). Following the jury verdict, the court requested that the parties brief the issues raised in Wright's motion to dismiss that constituted the basis of Wright's motion for judgment of acquittal. Wright's motions are now fully briefed in Wright's May 10, 2002 letter brief (D.I.82), the Government's May 20, 2002 response (D.I.83), and Wright's May 23, 2002 reply brief (D.I.84). This is the court's decision on Wright's

---

**2.** Counts XVIII and XIX allege that Wright was untruthful to federal investigators when they initiated their investigation into this matter. As Wright's convictions of those counts are not at issue in Wright's post-trial motions, the court need not go into further detail about these counts.

post-trial motions for new trial and judgment of acquittal.

## II. *DISCUSSION*

### A. *Should the Court Grant Wright's Motion for a New Trial?*

Federal Rule of Criminal Procedure 33 provides that "the court may grant a new trial to the defendant if the interests of justice so require." Fed.R.Crim.P. 33. The defendant bears the burden of proving the necessity of a new trial. *See United States v. Davis*, 15 F.3d 526, 531 (6th Cir.1994). A new trial should be granted upon "[a]ny error of sufficient magnitude to require reversal on appeal." 3 Charles A. Wright, Federal Practice and Procedure § 556 (1982). Thus, if this court had erroneously excluded evidence, and such error was not harmless, then a new trial would be appropriate.

This requires a three-fold analysis. First, what was the specific evidence that was excluded? *See* Fed.R.Evid. 103(a)(2). Second, was the specific evidence properly excluded? Third, if certain evidence was improperly excluded, did it affect a substantial right of the defendant? *See* Fed. R.Evid. 103(a). If there is a high probability that the purported error did not contribute to the judgment, that purported error is harmless and is not a basis for reversal, or, in this context, a new trial. *See United States v. Dispoz–O–Plastics*, 172 F.3d 275, 286 (3d Cir.1999).

Wright asserts that three evidentiary rulings were erroneous and would be reversed on appeal. First, Wright objects to the court's exclusion of "character" evidence of Representative Plant's honesty and integrity. Second, Wright objects to the court's exclusion of evidence of Representative Plant's "habit" of carrying around large sums of cash and "frequently" making cash loans to friends. Third, the defendant objects to the exclusion, on hearsay grounds, of the testimony of Plant's attorney, Kathleen Jennings, Esquire. Wright contends that Jennings would have testified that Plant told her it was his habit to carry large sums of cash and to make cash loans to friends, and that the monies he received from the defendant were repayments of a loan, and not a bribe.

As further detailed below, the court concludes that none of the three evidentiary rulings that the defendant challenges were erroneous or warrant a new trial, and therefore will deny his new trial motion.

### 1. *Character Evidence*

█ Wright contends that evidence of Representative Plant's character and reputation for honesty and integrity was relevant and central to his defense in that "[e]vidence of Plant's reputation in the community is circumstantial evidence from which a juror may rely on to [conclude] that Plant would not have taken a bribe, if offered." However, as the Government points out in its response, the rules of evidence specifically provide that "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except [for various situations involving the character of the accused, the alleged victim, or a witness]." Fed.R.Evid. 404(a). As Representative Plant was not the accused, an alleged victim, or a witness, evidence of his character, offered to show that he acted in conformity therewith, is not admissible evidence. Moreover, as it is the acts of the defendant Wright that were at issue in the case, an extended side-trip into the character of the now-deceased Representative Plant would have been an irrelevant distraction.

## 2. *Habit Evidence*

■ Wright next asserts that the court improperly excluded evidence of Representative Plant's habit of carrying large sums of cash and "frequently" making cash loans to friends. At trial, counsel for Wright represented to the court that Plant's wife, Hazel Plant, would have so testified. While Hazel Plant testified as to a number of other matters during the trial, the court excluded any testimony about this "habit" as inadmissible under Federal Rule of Evidence 406.

It remains the court's view that such evidence properly was ruled inadmissible. First, this testimony is not proper habit evidence. Federal Rule of Evidence 406 provides that "evidence of the habit of a person ... is relevant to prove that the conduct of the person ... on a particular occasion was in conformity with the habit...." Fed.R.Evid. 406. The Advisory Committee Notes to Rule 406 explain that habit "describes one's regular response to a repeated specific situation ... such as the habit of going down a particular stairway two stairs at a time, or of giving the hand signal for a left turn .... The doing of habitual acts may become semi-automatic." Fed.R.Evid. 406 Advisory Committee Notes (1972); *see also* Weinstein's Federal Evidence, 2d. Ed., Vol. 2 § 406.02[3], pg. 406–6 (explaining that "[a] habit is specific and particular [and that] [i]t must be distinguished from character, which is a generalized description of one's disposition").

Thus, to qualify as habit evidence, the proffered evidence must be specific and particular. In this case, it was neither. Plant's general tendency to loan money to friends was not so reflexive or automatic as to qualify as a habit. The defense's proffer as to the amount of the money Plant carried and the amount of the cash loans he purportedly made was non-specific and non-particular. Rather, it was at most a generalized description of Plant's disposition; and that may not be relied upon to prove Plant's conformity therewith on this specific occasion.

While testimony regarding one's habit may be used to prove conformity therewith, because of the high likelihood that a person conformed with their habit in a given circumstance, evidence of one's character may not be so used. The main reason that the Federal Rules of Evidence generally do not permit character evidence to be used to prove conformity with that character on specific occasions is that such evidence clouds the actual focus of the factual inquiry into the facts of the transaction at issue. As the Advisory Rules to Rule 404(a) notes: "Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

Testimony about Plant's general character trait of generosity cannot suffice to prove that the payments that Wright deposited in his account—which totaled approximately $75,000—were simply repayments for loans. To prove this, Wright required non-character evidence about the specific loan transactions between himself and Plant. Moreover, the court notes that Wright claimed that he borrowed thousands and thousands of dollars from Plant in increments that were sometimes as large as $11,000. As the court explained at trial, in light of the fact that the defendant could offer no one to testify that Plant generally carried more than $500 in cash, with which he used to loan money to friends, the fact that Plant carried around "large sums of money" and "frequently

made loans to friends" is not particularly probative as to whether Plant did in fact loan money to Wright in the amounts and increments that Wright claimed. Plant's general propensity to loan money adds little to Wright's defense that he and Plant entered into specific loan transactions. Such character evidence, which Wright tries to dress up as habit evidence, is simply not admissible.

Furthermore, while it is not necessary to consider the harmlessness of any supposed error in excluding the proffered testimony, there is no reason to believe that Hazel Plant's testimony would have been anything more than cumulative. Hazel Plant testified that she was present on one occasion when Representative Plant loaned $11,000 cash to Wright, and that she complained that he was taking better care of Wright than his own family. She also testified that Representative Plant frequently wrote checks for $2,500 and cashed them. Another witness, Sammy Congo, testified that Representative Plant once loaned him $500 in cash, and that Congo paid him back. There is a high probability that any further "habit" evidence coming from Hazel Plant would not have affected the jury's verdict.

3. *Hearsay Evidence—Kathleen Jennings Proffered Testimony*

■ Last, Wright asserts that Kathleen Jennings, Esquire, a criminal defense attorney consulted by Plant after the investigation into Suburban Street Funds began but before any indictment issued, should have been allowed to testify that Plant told her the monies he received from the defendant were repayments of a loan, and not a bribe. Plant consulted Jennings ten months before his death. As Jennings

testimony is hearsay—it is an out of court statement offered to prove the truth of the matter asserted, *see* Fed.R.Evid. 801(c)—it is inadmissible unless it is subject to a hearsay exception or is offered for a non-hearsay purpose.

At trial, Wright offered Jennings' testimony for the truth of the matter asserted pursuant to the residual hearsay exception codified in Rule 807. To be admissible under Rule 807, the proposed testimony must have "equivalent circumstantial guarantees of trustworthiness" to other testimony admitted pursuant to other hearsay exceptions set forth in Rules 803 and 804, and must be "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts.[3]" Fed.R.Evid. 807. The Third Circuit has noted that the residual hearsay exception is "to be used only rarely, and in exceptional circumstances," and is meant to "apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United States v. Bailey,* 581 F.2d 341, 347 (3d Cir.1978). The decision to exclude evidence offered under the residual hearsay exception of Rule 807 is entrusted to the court's discretion and is reviewed for an abuse of discretion. *See United States v. Ferri,* 778 F.2d 985, 991 (3d Cir.1985).

The court does not believe that it abused its discretion in excluding the proffered evidence. Wright contends that because the witness was at the time Representative Plant's attorney, the circumstances under which Plant made the statements provide the requisite "circumstantial guarantees of trustworthiness." Any "evaluation of the 'trustworthiness' of an out-of-court statement must [ ] focus upon 'the circum-

---

**3.** Rule 807 was created in 1997, and combined the former rules 803(24) and 804(b)(5). The advisory notes state that no change of meaning was intended. Thus cases decided before 1997 under the former rules are equally applicable to Rule 807.

stances in which [the declarant] made the statements and the incentive he had to speak truthfully or falsely.'" *Id.* While it is true that Plant's confidential relationship with his attorney is one indication that Plant's statements would be truthful, other circumstances of Plant's conversation with Jennings provide insufficient circumstantial guarantees of trustworthiness. Plant's statements to his attorney were not under oath, and there was no penalty for him lying to his attorney. Additionally, the circumstances surrounding Plant's meetings with his attorney contained incentives for him to lie. Plant's statements were self-serving statements made at a time when he knew he was under investigation and had a motive to not tell the truth. Human nature is to deny committing crimes, especially for a public figure who is held in high esteem by the community and knows he is under investigation. In light of these considerations, the court concludes that the hearsay statements at issue are not sufficiently reliable to merit admission under the residual hearsay exception.[4]

Wright relies on *Copperweld Steel Co. v. Demag Mannesmann Bohler*, 578 F.2d 953 (3d Cir.1978), to argue that the court erred in not admitting Jennings' testimony under the residual hearsay exception. In that case, the Third Circuit held that the trial court's decision to admit a memorandum prepared by an attorney of a witness was not clearly erroneous. *Id.* at 964. It does not follow, however, that the Third Circuit would find this court's decision to exclude Jennings' testimony to be an abuse of discretion.

The holding of *Copperweld* does not convince the court that its decision to exclude Jennings' as hearsay was incorrect or reversible error. In *Copperweld*, the trial court had found the memorandum trustworthy, as "there was no reason presented to doubt its truth."[5] *Id.* The trial court further found that the out-of-court statement, which contained the thought processes of a key figure in the case, was "more probative than any other evidence admitted."[6] *Id.* As articulated above, in this case there was substantial reason to doubt the truth of what Representative Plant told his attorney and to conclude that there were insufficient circumstantial guarantees of truthfulness. In addition, in this case, Representative Plant's uncross-examined statements to his attorney were not more probative than any other evidence that could reasonably have been procured concerning the nature of the transactions between Plant and Wright. *See* Fed.R.Evid. 807. Wright's testimony about the transaction was the most probative on that point.

---

4. Hearsay evidence is generally excluded because the opposing party does not have the opportunity to test the reliability of the statements through cross-examination. The reason that the hearsay exceptions exist is that there are certain circumstances that the hearsay is considered so reliable that cross-examination of the out-of-court declarant is not necessary. In this case, the court cannot conclude that the circumstances guarantee that the statements are of that caliber of reliability.

5. It should be noted that in *Copperweld*, the attorney who drafted the memorandum represented Copperweld, and the out-of-court declarant was a key management official at Copperweld. The memorandum was offered by the opposing party. Thus, the memorandum was sufficiently close to a recognized category of admissible evidence—an admission by party opponent, *see* Fed.R.Evid. 801(d)(2)(D)—so that it possessed some guarantees of trustworthiness.

6. It would have been a more correct statement to state that it was more probative than any other evidence that could have reasonably been procured. *See* Fed.R.Evid. 807.

B. *Should the Court Grant Wright's Motion for a Judgment of Acquittal on the Money Laundering and Conspiracy Counts?*

Federal Rule of Criminal Procedure 29 provides that the court can grant a motion for judgment of acquittal "if the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). In addressing such motions, " 'all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to each element of the offense.' " *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984). Moreover, the "court should not substitute its own determination of the credibility of witnesses, the weight of the evidence, and the reasonable inferences to be drawn for that of the jury." *Id.*

■ Defendant seeks an order of acquittal on the charges of conspiracy, *see* 18 U.S.C. § 371, and money laundering, *see* 18 U.S.C. § 1956(a)(1)(B)(i) and 2. The predicate offense for these charges was a violation of 18 U.S.C. § 2314 (interstate transportation of stolen property). Both conspiracy and money laundering have elements that require the defendant to commit the crime "knowingly." Prior to trial, the Government stipulated that there was no evidence that Wright knew that the bank that he deposited the checks into, Sun National Bank, or any employee at the bank sent checks to Pennsylvania for "clearing." At trial there was no evidence presented that the defendant knew that any transactions involving the checks would travel in interstate commerce. Wright thus argues that there was no evidence that would allow the jury to find that the state of mind elements of the conspiracy and money laundering offenses were met. Specifically, Wright contends that because there was no evidence that Wright "knowingly" committed the predi-cate crime of interstate transportation of stolen property (i.e., Wright did not have any knowledge that the three City of Wilmington checks that were the basis for the interstate transportation of stolen property convictions were going to travel from Delaware to Pennsylvania), the evidence at trial was insufficient to sustain convictions of these offenses as charged in the indictment.

Wright's challenge is based on a faulty premise. The state of mind elements of the conspiracy and money laundering offenses do not require that Wright have knowledge regarding the interstate nature of the transportation of stolen property. Wright's knowledge of the interstate nature of his actions is irrelevant to whether the state of mind elements of conspiracy and money laundering are met.

Turning first to conspiracy, the knowledge element of a conspiracy charge involves proof that the defendant knowingly agreed to commit the acts that would constitute a federal offense. The knowledge requirement of the conspiracy does not "raise the bar" of the knowledge requirement of the predicate crime. Thus, for example, in an assault on a federal officer prosecution, the Government must prove that the officer was a federal officer, but does not have to prove that the defendant knew that. In a conspiracy to assault a federal officer prosecution, the government need only prove that the defendant knowingly agreed to assault an individual (who happened to be a federal officer), but does not have to prove that the defendant knew the victim was a federal officer. *See United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). In this context, like in the assault of a federal officer example, the underlying offense—interstate transportation of stolen property—does not require knowledge of the basis for federal jurisdiction. *See Wright,* 194

F.Supp.2d. at 294–95 (finding that interstate transportation is a jurisdictional element and that defendant's knowledge thereof need not be proved to prove the crime). Therefore, as in *Feola*, a conspiracy to commit this underlying offense also does not require knowledge of the basis for federal jurisdiction. *Feola*, 420 U.S. at 696, 95 S.Ct. 1255. Thus, a conspiracy to commit interstate transportation of stolen property does not require any more knowledge of the jurisdictional requirements than is required by the interstate transportation of stolen property charge.[7]

█ Similar reasoning applies to the money laundering charges. The jury instruction on the money laundering charges correctly required the jury to find, amongst other things, that "the defendant *knowingly* conducted a financial transaction," "*knew* that the property ... represented the proceeds of some form of unlawful activity," and "engaged in the transaction *knowing* that the transaction was designed ... to conceal or disguise the location, the source or ownership of the proceeds as specified unlawful activities." (emphasis added). However, this language does not require that Wright knew that the checks would travel in interstate commerce. What this language requires, as the jury instructions state, is knowledge of an intent to conceal the proceeds of the criminal activity. As further provided by the jury instructions, all that is required is that the financial transaction involved "proceeds from some form, though not necessarily which form, of activity that constitutes a felony offense under state or federal law." As Wright ad-

mitted that he knew that he had taken the money without authorization, his lack of knowledge as to its subsequent interstate travel does not merit a judgment of acquittal.

Accordingly, the court will deny Wright's motion for judgment of acquittal as to the conspiracy and money laundering charges.

### C. Should the Court Grant Wright's Motion for a Judgment of Acquittal on the Bribery Counts?

As noted above, Wright moved to dismiss the bribery counts before trial, arguing that based on the set of stipulated facts concerning the connection between federal funds and the alleged bribery in this case, the Government could not meet its burden in proving Wright guilty of the bribery counts. In its March 22, 2002 memorandum opinion, the court reviewed the relevant Third Circuit case law addressing the federal interest requirement in connection with 18 U.S.C. § 666, noting that "given that the relevant Third Circuit cases ... have interpreted § 666 as [requiring a federal nexus], the inquiry for the court is whether, under the standards set forth in those cases, there is a sufficient federal nexus in this case." *Wright*, 194 F.Supp.2d. at 300–01. After reviewing the stipulated facts, however, the court found that factual record on the issue was not yet developed fully enough to allow the court to determine, before trial, whether or not the federal interest requirement could in this case be satisfied. *Id.* at 302.

---

**7.** In its pre-trial opinion on Wright's motion to dismiss the indictment, the court rejected Wright's contention that a defendant must know that the stolen instrument will travel in interstate commerce to be charged with interstate transportation of stolen property under 18 U.S.C. §§ 2314 and 2. Following the great

weight of appellate authority on the issue, the court instead concluded that the interstate transportation is simply a jurisdictional element and that it is not required that the defendant have knowledge of the interstate transportation. *Wright*, 194 F.Supp.2d. at 291–95.

Now, with the benefit of a full factual record, the court will revisit this issue.

### 1. *Relevant Facts*

The parties do not dispute the relevant facts as to the connection between federal funds and the Suburban Street Funds. They do, however, contest whether the set of facts before the court in this case are sufficient to satisfy the federal nexus requirement of 18 U.S.C. § 666. *See Zwick,* 199 F.3d at 687 (" § 666 requires the government prove a federal interest is implicated" by the defendant's conduct). To frame the court's analysis of this issue, the court will summarize the relevant evidence from the trial on this point.

Every year the State of Delaware passes a bond bill as part of its capital budget process. Part of the Delaware State capital budget funds a program called the Suburban Street Funds under which each of Delaware's sixty-two legislators receives $300,000 per year from State funds to use for transportation related projects in his or her district. The Suburban Street Funds thus totaled approximately $18 million ($300,000 × the 62 State legislators) every year. The various amounts of money authorized by legislators to be paid out of their respective sixty-two accounts were 100% State dollars, and no federal dollars ever went into those individual accounts. The $300,000 per legislator remains the State of Delaware money until it is spent.

The Suburban Street Funds are administered through the Delaware Department of Transportation ("DelDOT"). Earle Timpson is the Capital Program Administer for the Department of Transportation. He is responsible for the management of the Suburban Streets Program, and he tracks the money each legislator maintains in his or her Suburban Street Fund account in sixty-two separate check books or ledgers. Timpson explained that in 1999 and 2000, Suburban Street Funds were supposed to be spent on projects that benefit more than one individual, that relate to public property or at least to land dedicated to public use, and that are related to transportation. Timpson testified at trial that the "Suburban Street Funds are all 100% State funds" that are raised from State revenue sources.

Under contracts between DelDOT and the City of Wilmington, legislators could choose to transfer their allotted portion of the State-funded Suburban Street Funds money to the City of Wilmington to reimburse the City for street light depreciation or transportation related debt service. Such funds were deposited into the City's general account. In return, the City of Wilmington then created an account containing an identical amount of funds, which the various legislators could allocate as they chose to non-profit agencies for human services projects. The approximately $150,000 allocated by Representative Plant to the New Mount Olive Baptist Church was given to the church under this program. Representative Plant requested the City of Wilmington Mayor's Assistant, Timothy Crawl–Bey, to issue the checks payable to New Mount Olive Baptist Church. The checks payable to the church were drawn on the City of Wilmington's general account.

The nature of the agreement between the City of Wilmington and DelDOT was to divert funds from the requirements of the Suburban Street Funds and away from street and highway components, so that the money could be used for various civic and charitable purposes in the City of Wilmington. Under these contracts, various legislators who represented, at least in part, portions of the City of Wilmington, including Representative Plant, arranged to have some portion of their $300,000 of

Suburban Street Funds sent from DelDOT to the City of Wilmington to pay for City of Wilmington obligations.

It is undisputed that the funds given to the City of Wilmington were also 100% State dollars. There were no federal dollars in any of the legislators' accounts when DelDOT cut checks and sent them to the City of Wilmington, and "not a penny" were federal dollars at the time Representative Plant authorized State Suburban Street Fund money to be paid to the City of Wilmington. As DelDOT was simply reimbursing the City, once a legislator authorizes payment to the City of Wilmington and a check was sent from DelDOT out of the legislator's Suburban Street Fund account to the City of Wilmington, DelDOT has no further interest in the money that went to the City of Wilmington's general account.

Gary Fullman, the Director of Financial Management and Budget with DelDOT during 1999–2000, testified that in response to a request made in connection with this case by Edward L. Watson, of the Office of the State Auditor, he authored a letter dated November 1, 2000, wherein he advised that the source of the Suburban Street Funds for 1999 and 2000 were "all State dollars" and that "all funding authorized for this program since its inception in the late 1970s has been strictly state funds." Timpson verified that the November 1, 2000 letter from Fullman was true and accurate, and testified that he too informed the Government that the source of funding for the Suburban Street Funds contained no federal funds.

The Suburban Street Funds were a part of DelDOT's capital budget. DelDOT's overall capital budget is approximately $300,000,000 per year. The DelDOT capital budget funds long-term transportation related projects such as road construction, road repair, sidewalks, and bicycle paths.

DelDOT's capital budget is supplied about 40% from federal sources, primarily the Federal Highway Administration and the Federal Transit Authority, with the remainder from state sources. One of the federal programs under which money is supplied to DelDOT is called "Transportation Enhancements," which provided $2 to $3.5 million per year for the same sorts of transportation related projects that are funded with Suburban Street Funds. Timpson explained that the "Transportation Enhancements" program funded certain transportation related improvements such as restoration of train stations or bus depots or the beautification of highways, bike paths, and walking trails.

Government witness and State of Delaware employee, William Newnom, testified that he is responsible for billing the federal government for the reimbursement of money spent by the State of Delaware. He explained, in particular, that Suburban Street Fund expenditures were accounted for as "Fund 56/00" expenditures. There were about $400,000 per year of "Transportation Enhancements" that were also classified as "Fund 56/00" expenditures. Newnom explained that Governments Exhibits 30A, entitled the DelDOT Fund 56/00 Expenditure Analysis for Fiscal Years 1999 and 2000, shows that in 1999 and 2000 there were ten to thirteen transportation related projects for which the federal government contributed a portion of the funds. Fullman confirmed that when federal funds are matched in this fashion, they are reimbursed to the State on a project by project basis.

In order to qualify for federal matching funds on these projects, federal law requires that the projects have at least 20% State funding. The federal funds were thus obtained by the State making eligible expenditures on Suburban Street Fund projects. The State than advised the Fed-

eral Highway Administration of the expenditure, which reimbursed the State approximately a week or so after the expenditure was made.

### 2. *Analysis: Do the Facts of This Case Demonstrate a Federal Interest?*

■ Section 666 of Title 18 of the United State Code, entitled "Theft or bribery concerning programs involving federal funds," provides that it is a federal crime to accept bribes to or solicit bribes from an agent of a state or local government that receives more than $10,000 in federal assistance in one year. *See* 18 U.S.C. § 666. As the court explained in its earlier memorandum opinion, the Third Circuit has interpreted § 666 as having a distinct "federal interest" requirement—apart from the requirement that there be at least $10,000 in federal assistance—that requires the government to prove that a federal interest is implicated by the defendant's offense conduct.[8] *See Wright*, 194 F.Supp.2d. at 295–300 (discussing *United States v. Zwick*, 199 F.3d 672 (3d Cir.1999) and *United States v. DeLaurentis*, 230 F.3d 659 (3d Cir.2000)).

---

8. Whether § 666 should be interpreted as requiring a federal nexus has been the subject of debate in both the courts and in scholarly publications since the Supreme Court intimated in *Salinas v. United States*, 522 U.S. 52, 58, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) that such an interpretation might be required in order to protect federalism concerns and ensure that § 666 is a valid enactment under Congress's spending power. Since *Salinas,* a circuit split has developed among the appeals courts, with at least the Second and Third Circuits requiring that there be some degree of federal nexus, *see United States v. Santopietro,* 166 F.3d 88 (2d Cir.1999), *United States v. Zwick,* 199 F.3d 672 (3d Cir.1999), *see also United States v. Phillips,* 219 F.3d 404 (5th Cir.2000) (finding absence of federal connection as relevant to another inquiry but expressly declining to address whether federal nexus is required), *but see United States v.*

The federal interest requirement of 18 U.S.C. § 666 was reflected in Section 3.3 of the Jury Instructions, which the court will set forth in full. Jury Instruction 3.3 states that:

Counts 9 to 17 of the Indictment accuse the defendant of Bribery in violation of federal law. For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each and every one of the following elements beyond a reasonable doubt:

*First,* that the defendant corruptly gave something of value to an agent of State Government;

*Second,* with the intention to influence or reward the agent of State Government in connection with a transaction or series of transactions of the State Government;

*Third,* where the transactions or series of transactions involved anything of value of $5,000 or more;

*Fourth,* when the State Government received in excess of $10,000 in federal funds per year and the defendant's offense conduct implicated a federal interest.

---

*Reyes,* 239 F.3d 722 (5th Cir.2001) (declining to follow *Zwick* and *Santopietro* ) while a number of other circuits do not so require. *See United States v. Dakota,* 188 F.3d 663 (6th Cir.1999); *United States v. Grossi,* 143 F.3d 348 (7th Cir.1998), *see also United States v. Sabri,* 183 F.Supp.2d. 1145 (D.Minn.2002). Recent scholarly articles have highlighted the issue and advocated both for and against interpreting § 666 to have a federal interest requirement. *See e.g.,* Paul Salvatoriello, *Note, The Practical Necessity of Federal Intervention Versus the Ideal of Federalism: An Expansive View of Section 666 in the Prosecution of State and Local Corruption,* 89 Geo. L.J. 2393 (2001) (advocating broader reach of § 666); Cheryl Crumpton Herring, *Note, 18 U.S.C. § 666: Is it a Blank Check to Federal Authorities Prosecuting State and Local Corruption?,* 52 Ala. L.Rev. 1317 (2001).

The fourth element of the crime that the jury had to be convinced that the Government proved beyond a reasonable doubt was that "the State Government received in excess of $10,000 in federal funds per year *and the defendant's offense conduct implicated a federal interest.*" (emphasis added). It is undisputed that the State of Delaware received in excess of $10,000 in the relevant years, 1999 and 2000. Wright contends, however, that the Government could not and did not prove that "the defendant's offense conduct implicated a federal interest." Thus, the issue presently before the court is whether, according to the framework established in the court's prior opinion, the above set of facts satisfy the "federal interest" requirement of 18 U.S.C. § 666.

In his post-trial briefing Wright contends that the Government failed to prove a "federal interest" at trial sufficient to sustain the bribery charges or conviction, because there was no evidence at trial that the conduct of defendant Wright or Representative Plant affected a federal program and thereby implicated a federal interest. Instead, the evidence established that the Suburban Street Funds that were diverted pursuant to the alleged conspiracy and bribery scheme between Representative Plant and Wright were entirely State funds generated from state revenue sources.

In response, the Government notes that "a highly attenuated implication of a federal interest will suffice," *see Zwick,* 199 F.3d at 687, and that while "the evidence must show some connection between the defendant's bribery activities and the funds supplied by the federal government, or the programs supported by those federal funds ... [,] it is not necessary to show that the bribery activities of the defendant actually impacted the federal funds them-

selves, or had a direct bearing on the expenditures of those funds." *DeLaurentis,* 230 F.3d at 661–62. The Government articulates the federal interest as follows. Representative Plant gave to the New Mount Olive Baptist Church approximately $150,000, which was thereafter distributed by Wright to his own personal account and that of Representative Plant. By using that money to bribe Representative Plant and to pay himself off, money that could have been spent on transportation-related projects, and that could have been matched with federal dollars though the "Transportation Enhancements" program, was instead stolen and therefore unavailable for road construction, road repair, sidewalks, bike paths, and the like. The Government reasons that because Suburban Street Funds' transportation related projects are funded with both state funds, which are authorized through Suburban Street Funds legislation, and federal funds, which are supplied through reimbursements under the "Transportation Enhancements" program, there is a federal interest in preventing bribery relating to Suburban Streets projects, regardless of whether the bribery involves state funds or federal funds.

The court stated in its earlier memorandum opinion that while "the facts indicate that federal funds were earmarked for certain transportation related projects in Delaware by matching Suburban Street Funds[,] ... it is unclear how or whether the acts of bribery had any effect on projects that drew from those federal funds, such that the Government can claim a legitimate interest in discouraging the diversion of those funds through bribery." *Wright,* 194 F.Supp.2d. at 301 (noting that "the facts here constitute a stronger federal connection than was presented in *Zwick,* but a more attenuated connection than

presented in *DeLaurentis*."). After reviewing the trial record concerning nature of the federal relationship to the Suburban Street Funds, the court finds that the evidence fails to establish the requisite nexus between a federal interest and Wright's offense conduct..

The evidence at trial was that the Suburban Street Funds contained no federal funds at the origin; i.e., the State funds in each individual legislator's Suburban Street Funds account were generated from state revenue sources. These state funds were then paid to the City of Wilmington pursuant to the agreements between the City of Wilmington and DelDOT. Exercising (and abusing) his authority to distribute these funds to civic and charitable organizations within Wilmington as per his discretion, Representative Plant then requested checks payable to the New Mount Olive Baptist Church from the City of Wilmington, who issued those checks from the City of Wilmington's account. It was this money, funded from the State of Delaware and given to the City of Wilmington, and this specific City of Wilmington program that was affected by Wright's offense conduct.

The federal government bears no connection or interest in this money or in this program. While the federal government contributes, via a matching program, to fund certain transportation related projects, some of which are also partially funded with Suburban Street Funds money, the bribery at issue here did not involve any of those projects. Broadly conceived, the project or program involved in this case was the use of Suburban Street Funds money to fund City of Wilmington civic and charitable activities. The theft of those funds does not implicate a federal interest, because those projects are 100%

State funded with Suburban Street Fund money and no federal matching program exists to fund such projects.

Thus, the funds affected by defendant's conduct in this case are wholly state of Delaware funds with no connection to federal funds or programs. Moreover, the federal government does not supplement the Suburban Street Funds by adding and commingling federal matching funds to the pool of funds that may be used to perform transportation or civic projects. Instead, it supplements certain transportation related projects on a reimbursement basis. That certain of those projects may be dually funded by federal money and state Suburban Street Funds money does not vest a federal interest in the Suburban Street Funds.

The Government argues that a federal interest nonetheless exists, because DelDOT receives federal funds, administers the Suburban Street Funds program, and receives federal matching funds for certain Suburban Street Funds that are employed to fund transportation projects. It reasons from those facts that the bribe in this case involved the activities and capital program of DelDOT, and contends that since DelDOT receives federal funds, the federal interest requirement is met. The court does not construe the offense conduct so broadly. This view impermissibly collapses the federal interest requirement and the federal funds requirement, equating a federal interest with the mere receipt of federal funds. Such a reading of § 666 is at odds with *Zwick*, which stands for the proposition that not every bribery of a state or local public official is a federal offense simply because the State of Delaware receives federal funds every year. *See Zwick*, 199 F.3d at 686 (noting that without a federal interest requirement,

§ 666 "raises significant federalism concerns, turning traditionally local conduct into a matter of federal ... [and concluding that] We will not transform § 666 into a general federal anti-corruption statute when Congress had not clearly expressed its intention to do so."). While the federal government gives funds to DelDOT projects, as it likely gives to all the Departments of Transportation of all states, that does not in and of itself create a federal interest in briberies that are unrelated to the projects that it funds.

The Government's primary argument that the evidence is sufficient to meet the federal interest requirement is that, theoretically, if the Suburban Street Fund money had not been stolen by Wright and Plant pursuant to the bribery scheme at issue, it could have been used on transportation related projects that could have been matched with federal funds through the "Transportation Enhancements" program. But federal interests based on such an abstract connection cannot suffice; instead the "evidence must show some connection between the defendant's bribery activities and the funds supplied by the federal government, or the programs supported by those funds." The evidence in this case does not demonstrate this required connection.

Moreover, even if the court were to indulge in the exercise of determining whether the above theoretical federal interest were sufficient, based on the facts of this case, it still would conclude that no federal nexus exists. The State funds at issue in this case were paid to the City of Wilmington, pursuant to a legitimate contract between DelDOT and the City of Wilmington. If they were not designated by Representative Plant to be paid to New Mount Olive Baptist Church they would have been directed to another charitable or civic organization in the City of Wilmington, and not to any transportation related project that could have involved federal matching.

If Wright had bribed an official in connection with one of the transportation projects that were funded both by State of Delaware Suburban Street Funds money and federal Transportation Enhancements money, the federal nexus clearly would be met, even if the connection were an attenuated one. Such a case would be akin to *DeLaurentis*, 230 F.3d at 661–62. There, the indictment charged that the defendant Supervisor of Detectives, who worked under the supervision of the chief of police to assist in the enforcement of state alcoholic beverage laws, accepted bribes for interceding with the town council to permit renewal of a license of a particular bar that had been the focus of much police activity. *Id.* at 661. The federal funds were received from the Department of Justice and were used to pay the salary of an additional police officer for street patrol duties. *Id.* The Third Circuit found that the federal nexus was met, stating that "[w]hen it supplied the town ... with \$75,000 to strengthen its police patrols, the federal government had a legitimate interest in discouraging police corruption affecting the patrol activities it was financing." *Id.* at 662.

In this case, however, no federal funds were supplied to the City of Wilmington or the State of Delaware to fund the Suburban Streets Program, nor does the bribe involve any transportation related projects that are federally funded. Therefore, there is no legitimate interest in conduct that adversely affects state or local funded projects. As such, this is not an appropriate case for a prosecution involving

charges of violations of federal bribery laws.

Here, the connection between the federal funds and the offense conduct bears more resemblance to the type of connection that was found to be insufficient to meet the federal nexus requirement in *Zwick*, 199 F.3d at 687.[9] In *Zwick*, "the federal funds were provided to Ross township for reimbursement for emergency snow removal and funding of a project to prevent back steam erosion." *Id.* The Third Circuit concluded that this "bears no obvious connection to Zwick's offense conduct, which involved sewer access, use permits, and landscaping performance bonds." *Id.; see also Santopietro*, 166 F.3d at 93 (stating that although it was affirming a conviction where the bribe was " 'a threat to the integrity and proper operation of a federal program,' " it "would not permit the Government to use section 666(a)(1)(B) to prosecute a bribe paid to a city's meat inspector in connection with a substantial transaction just because the city's parks department had received a federal grant of $10,000"). Here, the federal government's provision of matching funds on a project-by-project basis to certain transportation related projects bears no connection to Wright's offense conduct, which involves the misuse of Suburban Street Funds that were intended to fund various civic and charitable purposes in the City of Wilmington.

No matter how the evidence in the case is viewed, it is insufficient to demonstrate that "the defendant's offense conduct implicated a federal interest." Accordingly, the court will grant in part Wright's motion for a judgment of acquittal on the bribery counts, Counts IX through XVII.

## III. CONCLUSION

The court will deny Wright's motion for a new trial on the interstate transportation of stolen property counts, because the court does not find that any of the three evidentiary rulings to which Wright objects are erroneous or would be reversed on appeal. The court will also deny Wright's motion for judgment of acquittal on the conspiracy and money laundering charges, because the court finds that there was sufficient evidence to convict him of those charges. Last, the court will grant Wright's motion for judgment of acquittal on the bribery charges, because the court finds that there was insufficient evidence that Wright's conduct implicated a federal interest.

The court will issue an order consistent with this memorandum opinion.

---

**9.** The court acknowledges that neither *Zwick* nor *DeLaurentis* are directly analogous, as facts in this case distinguish it from both cases. As the court noted earlier, "the facts here constitute a stronger federal connection than was presented in *Zwick*, but a more attenuated connection than presented in *DeLaurentis*." *Wright*, 194 F.Supp.2d. at 301.

The comparisons between these two seminal cases are made only to illustrate that it is the opinion of this court that this case is more analogous to *Zwick* than to *DeLaurentis* in that the court does not believe that the evidence is sufficient to meet the federal interest requirement.